UNION TYPEWRITER CO. v. L. C. SMITH & BROS.

(Circuit Court, W. D. Pennsylvania.   September 10, 1909.)

1. PATENTS (§ 45*)—ANTICIPATION—INVENTION—DATE OF CONCEPTION AND EXERCISE OF DUE DILIGENCE, WHEN IMMATERIAL—PRIOR PATENTS AS ANTICIPATING PUBLICATIONS—DATE OF APPLICATION THEREFOR.

Where there is a mere comparison of a patent with others, to determine the novelty of the device, it is immaterial just when the invention was conceived or reduced to practice, or whether due diligence was used; these being important only in interference proceedings, or where an issue of priority is raised. And neither are the dates of the applications of alleged anticipating patents of any account in such a case; a patent taking rank as a publication, negativing novelty, only when it comes out, and a mere application having no such effect.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 51–53; Dec. Dig. § 45.*]

2. PATENTS (§ 106*)—INTERFERENCE PROCEEDINGS—ISSUES BETWEEN NARROWER AND BROADER CLAIMS—RIGHT OF SUCCESSFUL PARTY TO APPROPRIATE LATTER.

Where application is made for a specific form of invention by one inventor, and the claims embodying the same are thrown into interference proceedings with generic claims in the pending application of another inventor, upon the issue of priority being decided in favor of the former, he is not entitled to the broader conception of the other, being confined to the particular mechanical construction for which he has declared. The fact that the device of which he was found to be the original and first inventor shut out the broader conception of the other did not make the latter, or the claims by which it was expressed, his.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 146; Dec. Dig. § 106.*]

3. PATENTS (§ 106*)—INTERFERENCE PROCEEDINGS—RIGHT TO APPROPRIATE ISSUES.

Where, therefore, in an application for a typewriting machine, the invention as described in the specifications consisted substantially in mounting the type-bar series in a rocking cradle, arranged to carry both type bars and keyboard, by means of which the type bars were shifted vertically, according as one type or the other was to be brought to the printing point, a rocking frame or cradle, carrying keyboard and type bars, and shifting the latter vertically, was of the essence of the invention, and anything outside of and beyond this could not be consistently claimed. The issues in interference proceedings, taken from the application of another inventor, in which a vertical shifting of the type-bar frame, without more, was broadly claimed, could not, merely because of the interference proceedings being decided in favor of the narrower invention, be written into the application therefor.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 146; Dec. Dig. § 106.*]

4. PATENTS (§ 120*)—REISSUE—ENLARGEMENT BY AMENDMENT OF LATER PATENT—IMPROVEMENTS.

A reissue is ordinarily the only remedy when a patent is found not to be expressive of an invention to its full breadth. An enlargement of it is not to be effected by the engrafting of broad claims upon a later patent, based upon an application of narrow scope, particularly where the second

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

patent is applied-for as an improvement on the first; it not being the office of an improvement to enlarge or broaden, but only to better in detail.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 172; Dec. Dig. § 120.*]

5. PATENTS (§ 120*)—SUCCESSIVE PATENTS—TOO BROAD TO BE FOLLOWING NARROWER FIRST—CO-PENDING APPLICATION.

Where an application, in which an invention is expressed broadly, is pending at the same time with one upon narrower lines, the taking out of the latter does not necessarily preclude the subsequent allowance of the other in broader form. As, for instance, (a) where the application for a broad patent was made first, and is delayed by the Patent Office through no fault of the inventor; or (b) where the later generic patent and the earlier specific one bear a divisional relation, the two being in effect one: but not (c) necessarily where one is a continuance of the other, particularly where the later patent is in terms for an improvement on the other and conforms strictly to that idea.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 172; Dec. Dig. § 120.*]

6. PATENTS (§ 120*) — ATTEMPTED BROAD CONSTRUCTION OF LATER PATENT — DOUBLE PATENTING.

Where, therefore, an earlier patent, with specific narrow claims, is allowed to come out, and after it has issued, claims of alleged broad or generic scope are brought in by way of amendment to another patent, which is applied for as an improvement on the first, the claims of the second patent, if construed broadly, being conflicting with and anticipated by the first patent, are void as amounting to a second patenting of the same invention, which the law does not allow, a result which the co-pendency or overlapping of the second application is powerless to prevent.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 172; Dec. Dig. § 120.*]

7. PATENTS (§ 328*)—INFRINGEMENT—TYPEWRITING MACHINE.

The Daugherty patent, No. 481,477, for a typewriter of the type in which the writing is visible when being written, claims 37 and 38, the dominating feature of the device being the vertical shifting of the type-bar frame to bring into position one or the other of the different kinds of type carried thereby, while generic in form, must be limited, in view of a prior patent to the same inventor, to the specific means disclosed for shifting such frame. While not anticipated by anything in the prior art as so construed, *held* not infringed by the defendants' device.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

(Syllabus by the Court.)

In Equity. Suit for infringement of letters patent No. 481,477, for a typewriter, issued August 23, 1892, to James D. Daugherty. On final hearing.

Clarence P. Byrnes and Henry D. Donnelly, for complainant.
James A. Watson and Livingston Gifford, for defendants.

ARCHBALD, District Judge (specially assigned). The patent in suit is for a so-called "visible" typewriter, in which the printing is at all times able to be seen by the operator, without stopping the work or

moving any part. This is a desirable feature, and may well be taken as characteristic of the coming machine, if not, indeed, indispensable to it. Accompanying this, the machine of the patent has a single bank of keys, with type bars carrying different type—upper and lower case letters, different marks of punctuation, numerals, and the like—the segmental frame in which they are mounted being made to shift vertically in order to bring the one or the other character to the printing point. It is the vertical shifting of this frame that dominates the device; a single keyboard with two-character type bars and a front stroke, with resulting visibility, being thereby secured.

The defendants manufacture a typewriter which also has two-letter type bars, pivoted concentrically on a segmental frame, which is shifted vertically to bring the different characters to the printing point. The only distinction from the machine of the patent, taking it as it reads, consists of the "hitch up" between the key lever and type bars, which in the complainant's machine is direct, both keyboard and type bars being carried on a pivoted frame or cradle, by the rocking of which, without breaking the connection, the shifting of the type-bar frame is brought about; while in the defendants' machine the connection is by links, permitting the keyboard to remain stationary, the type-bar frame alone being moved.

The patent was issued to James D. Daugherty August 23, 1892, on an application filed March 8 of the same year; the invention going back, as it is said, to some time in 1883. There are two claims relied on, as follows:

"37. In a typewriter, the combination, with a series of individual pivoted type bars carrying two or more type, of a vertically-shifting frame for sustaining said bars and suitable means for shifting said frame to bring either of the type in proper position to make an impression.

"38. In a typewriter, the combination, with a series of type bars provided with two or more type, of a vertically-shifting frame for sustaining said type bars concentrically, a series of key levers connected with said type bars, and a series of keys for operating said levers."

The only difference between these claims is that in the last the type bars are concentrically sustained. Taking them broadly as they read, they cover every machine in which, with the other elements involved, there is a vertical shifting of the type-bar frame; and according to this, without more, the defendants infringe. It is only as they are restricted to the particular character of structure specified in the patent in which this idea is utilized that they do not. It is on the construction, therefore, to be given to them, the patent being valid, that the case turns.

There is nothing to anticipate the patent, whatever its construction, in the prior art. With all the variety which there appears, there is no device to in any way correspond. The idea of visibility, no doubt, was not new. There was a crude attempt at it in the Horton, which was applied for as early as March, 1882, as well as in the Brooks of the same year, to say nothing of the Fitch (1886), the Prouty and Hynes (1887–

1888).[1] the Grundy (1887–1889), the Sholes (1889–1891), and the Copeland (1887–1892), which followed on. Neither was it new to shift the type-bar frame, to bring the upper or lower character to the printing point. The usual shifting was of the platen or roller, against which the type bars strike, as in the Brooks (1875–1878), the Jenne (1879–1897), and the Sholes (1889–1891). But the shifting of the type segment as an alternative is suggested in the Brooks, which is the original two-letter type-bar machine, only it is so undeveloped as to be of little account. It definitely appears in the Wagner (1885), the Fitch (1886), the Unz (1887–1896), the Scudder (1886–1891), the Copeland (1887–1892), and the second Wagner (1888–1889). But in each of these the shifting is horizontal, and not vertical, an important distinction, as upon it the visibility of the writing, as well as the other advantages residing in the present invention, are worked out.

Nor can it be successfully maintained that it involved nothing patentable to transfer the shifting from the platen to the type-bar segment, or to change the direction to up and down. Invention has often been predicated upon less; and the highly beneficial results thereby secured fully justify its recognition here. It may not be entitled to any extended scope. Union Writing Machine Company v. Domestic Sewing Machine Company, 109 Fed. 85, 48 C. C. A. 244. It is not as though Daugherty originated the visible idea. That, by suggestion at least, was already in the art, although it must be conceded that he was the first to give it practical shape. And so, possibly, was the shifting of the type-bar segment, although that depends on how far the invention is able to be carried back. It is tied up also, to a certain extent, to the concrete expression of it which we have. And it may be doubtful whether the inventor had any conception of it outside of the rocking cradle, carrying keyboard and type bars, which he devised, except as in one of his patents he shifts the platen vertically instead. But, allowing all that is so said, there can be no question as to the novelty and inventive character of that for which the device, all things considered, is entitled to stand.

It is immaterial, in view of this, to inquire just when the invention was conceived, or at what date there was a reduction to practice, or whether due diligence was used, of which considerable evidence has been given, and which has been extensively discussed. These are important in interference proceedings, or where an issue as to priority between different inventors for the same invention is raised, but not where there is a mere comparison with other patents to determine the novelty of the device. Nor are the dates of the applications of alleged anticipating references of any account in such a case. A patent takes rank as a publication, negativing novelty, only when it comes out. Bates v. Coe, 98 U. S. 31, 25 L. Ed. 68; Diamond Drill Co. v. Kelly (C. C.) 120 Fed. 282; Eck v. Kutz (C. C.) 132 Fed. 758, 764. A mere

[1] In each of these references the first date is the year when the patent was applied for, and the second, when it was granted, although, as we shall presently see, the last only, is of any account. Where but one is given, the application and the issue were the same year.

application has no such effect. The case of Automatic Weighing Machine Co. v. Pneumatic Scale Co. (C. C. A.) 166 Fed. 288, was one of priority of invention, and is not in point. It does not matter, therefore, how far in complete form the invention here is carried back. There is no question that it was in the mind of the inventor, in its essential features, as early as 1885, which, except the Brooks, the Horton, and the Wagner, which are of no consequence in this connection, is earlier than anything to which reference has been made. Indeed, so far as appears, it would be new and unanticipated at whatever time it came in. The validity of the patent, having regard to its general features, must therefore be sustained. The construction of the particular claims in controversy is the only question; and that depends upon considerations to be now discussed.

The first appearance of the invention in the Patent Office was by application filed November 15, 1889, which may thus be regarded as expressive of the original conception of it, of which those coming after are merely variant forms. This was held by the examiner to have been anticipated by certain references, and not to be mechanically operative; and, acquiescing in this view, on June 13, 1890, it was formally withdrawn. Having meantime perfected his ideas, and remedied what was wanting, the inventor, on May 2, 1890, filed a new application, which, after sundry rejections and amendments, was finally made the subject of interference proceedings, June 22, 1891, with the application of Arthur W. Street, as to two claims, which were held to be included in two of Street's. Before this, however, on June 9, 1891, certain other claims which had been allowed were canceled and made the subject of a divisional application, on which a patent, No. 457,258, was granted August 4, 1891. There is no particular significance in this patent, except as it is a part of the history of the proceedings of the Patent Office, and except, also, as it disclaims the pivoted shifting frame carrying the type bars shown in the others. Neither is there, to the patent for an improvement on both of these, which was applied for September 1, 1891, and granted July 12, 1892, as No. 478,925, save only that it provides for a vertical shifting of the platen, in place of the type bars. Meanwhile, in the interference proceedings, Daugherty, in his preliminary statement, having declared that he conceived the idea of shifting the type bars, instead of the carriage, as early as 1880, and his invention as a completed whole in the first part of 1885, while Street was only able to carry back his inventive conception to the spring of 1889, Street dropped out; and Daugherty, having gone on to a hearing and proved his contentions, was duly adjudged priority of invention January 21, 1892, and on March 15, 1892, patent No. 470,990 was issued to him accordingly. A week before this, on March 8, 1892, the patent in suit was applied for; and into this, by way of amendment, on June 23 following, claims 37 and 38, which are the subject of controversy were brought in; the patent issuing on August 23, two months afterwards. The question is as to the effect upon them, if any, of what had preceded.

These two claims were taken from the interference proceedings, being the first two—with a slight modification—of the Street claims.

They are more extensive than those of the Daugherty patent, No. 470, 990, with which they were put in issue; it being because of this inclusiveness that the interference was declared. For convenience of comparison they are inserted here:

Street Claims.

1. In a typewriter, the combination with a series of individual pivoted type bars, carrying two or more type, of a vertically shifting frame for sustaining said bars, and suitable means for shifting said frame to bring either of the type bars in proper position to make an impression.

2. In a typewriter, the combination with a series of type bars, provided with two or more type, of a vertically shifting frame for sustaining said type bars, and upon which said type bars are pivoted concentrically, of a series of key levers connected with said type bars, and a series of keys for operating said levers.

Daugherty Claims.

2. In a typewriter, the combination of a frame and a carriage supported horizontally thereon in an elevated position, of a horizontal frame pivoted between its ends below the said carriage, and a series of type bars pivoted in the inner end of the said frame, having each two letters, whereby the tilting of the frame will move the type bars vertically and bring either letter in position to print, substantially as shown.

1. In a typewriter, the combination with a carriage of a vertically shifting frame carrying key levers and type bars, the latter having each two or more characters, whereby, when the frame is shifted, the type bars and keys are moved therewith, substantially as shown.

That the interference was rightly declared there can be no doubt. The broad claims of the one comprehending and conflicting as they did with the narrow claims of the other, both could not be separately maintained. And it is this conflict in transposed relation that continues here. The inventor, as it is said, having allowed the invention to be patented in the restricted form found in claims 1 and 2 of No. 470,990, cut himself off from any broad and comprehensive construction of it, such as is now set up. There can be no question that this ordinarily would be the result. It is contended, however, that, as the outcome of the interference proceedings, Daugherty became entitled to the claims there in controversy in all their breadth, and could have made them a part of his pending application, and, being entitled to write them into that, it is immaterial that he chose to write them upon the one he did; his right to do so being preserved by its having been put in before the other went out. That is to say, the claims having a place by right in either application, it was of no consequence as to which one it was exercised, a dedication or abandonment not being chargeable against him, because of his choosing the later one to come out. But that does not altogether state the case. There are other considerations which obtain. The question is not alone one of dedication or abandonment, but of having two patents for the same thing, as well, which, except under extraordinary circumstances, which are not found here, is not allowed.

It is a question, in the first place, whether these claims had rightly a place in either application, let alone both. The priority awarded to Daugherty in the interference proceedings did not necessarily so decide. The narrow claims found in the application for No. 470,990, of which, as against Street, he was found to be the original and first

inventor, while shutting out those of Street, did not entitle him as of course to the broader conception which there appears. He had the right to maintain his own invention, in which the vertical shifting of the type bars was made use of, whatever it was, which so conflicted with that of Street that both could not stand. But that is all. It did not make either Street's invention, or his claims, his. In judging of what Daugherty was entitled to in this respect, regard had necessarily to be given to that for which he had declared. His invention was expressed in the particular mechanical construction, or its equivalent, described in the specifications, where it was set forth in detail, and to this, not being a pioneer, he was confined. Admittedly he could not patent a mere idea; such, for instance, as the shifting of the type-bar segment instead of the platen, without regard to direction, as the complainant's brief concedes. But the vertical shifting of it, without more, is little less.

Nor, looking into the specifications, is anything broad advanced. The inventor manifestly had a definite mechanical structure in mind, and that, and no more, is what he claimed to have devised. "The objects of my invention," as he there declares, "are to connect the key levers and the type bars directly at their inner ends without the intervention of any other parts, so as to simplify and cheapen the construction and lessen the friction in the operation of the machine; to separate the type bars and the key levers by means of division bars or plates, which prevent the parts from interfering with each other; to provide each type bar with a type or types having capital and small letters or other characters upon them, and to change from one letter or character to the other by raising the inner end of the frame, which carries the type bars and the key levers, while the roller or platen carrying the paper remains stationary; to pivot at its rear end the guiding frame for the type bars, and which also holds or carries the ribbon, and to give to this guiding frame a vertical movement at its free front end, so that, while it serves as a guide to the type bars, it also raises the ribbon, so that each type bar prints its character in alignment, and then, as the type bar drops back to its normal position, the guiding frame carrying the ribbon also drops, so as to leave each letter or character, as well as the whole line of writing, unobstructedly exposed to the operator without the movement of any other part; to operate the carriage by means of two pivoted, spring-actuated dogs, which allow the carriage to move forward one space each time that one of the type bars is operated, and which permit the carriage to slide freely back to its starting position." The scope of the invention is thus made clear, and the means taken to accomplish it is amplified in the following text.

It is demonstrated, from what there appears, that, as already stated, the invention, so far as we are concerned with it, consisted substantially in mounting the type-bar series in a rocking cradle, arranged to carry both type bars and keyboard, by means of which the type bars were shifted vertically, according as one type or the other was to be brought to the printing point. And to this the inventor was tied. Not but that he was entitled to reasonable equivalents, but not to the extent of an entirely different structure. A rocking frame or cradle, carrying keyboard and type bars, and shifting the latter vertically, was of its es-

sence, and anything in which this was not found fell outside of it, and could not be consistently claimed. The vital thing, no doubt, was the vertical shifting of the type bars. But that was only a feature on which the general structure, producing visibility, was worked out. It was not, and could not be made, the whole invention. If the inventor had a larger conception, it does not appear. In other words, his only idea of how the vertical shifting of the type-bar segment could be utilized to secure visibility, so far as given to the world, was in the way that he had done; every expression of it, in the various patents taken out by him, except the one in which the platen was shifted vertically, instead of the type bars, being patterned on the same plan. And in conformity with this all the claims of the patent are drawn. Nor is there anything in the history of the invention or the course of its development to sustain a broader view. The issues in the Street interference could not, therefore, with any propriety, have been written into patent No. 470,990, as claimed.

Neither was there anything to justify their being brought into the patent in suit. As is expressly declared in the specifications, this patent was applied for as an improvement on the two which had gone before, No. 457,258 and No. 470,990; the object being "to improve, simplify, and cheapen the construction of the mechanism there described, in the manner and for the purposes set forth." The particular improvements thereby introduced consisted largely in the special form of type-bar frame employed, which was composed of a block of metal, pivoted on the working frame or cradle by which it was shifted, and having vertical slots in which the type bars were set, to assist in guiding them to the printing point. "By the use of this block," says the inventor, "I am enabled to mill slots therein for guiding the type bars accurately, so that they will at all times be guided to the printing point, * * * which makes these blocks interchangeable, so that a new one can be placed therein for an old worn one. This is a great improvement," as he adds, "over the construction shown in the said patents, as the inner ends of the division plates, when depended upon to guide the type bars, are liable to become misplaced slightly, thus causing the type to stick in the guide, 22. So, also, owing to this rigidity of the inner end of the frame, 12, and the accurate guiding of the type bars thereby, the key levers may be supported independent of the shifting frame—that is, upon a rod, b', not connected with the shifting frame, 12, but supported by vertical ears, a', projecting from the base, A'—in which instance the said levers will simply turn slightly upon their pivoted point, b', when the frame is shifted." The other improvements specified are of a like character, all going to minor features of the same general device to be found in previous patents, on which it is not necessary to enlarge.

Considerable stress is laid upon the fact that the key levers are not pivoted to the rocking frame or cradle by which the vertical shifting of the type bars is brought about. The distinction is even said to be radical, but is really of little account, not differing in substantive effect from the alternative mechanism, which it supplants, as the inventor, upon cross-examination, is forced to admit. The key levers are mounted on the cradle and rock with it, under the action of the shift-

ing lever by which the type-bar segment is raised. The shifting lever and rocking frame are simply not interlocked. That is all. The patent in suit, therefore, attempted no radical departure from what had gone before. Accepting the same general construction, it merely sought to improve upon and perfect it, as the fact that it was an improvement implies. There was no suggestion in the application of any enlarging or broadening out, which is not the office of an improvement, but only, the making better of details. · And there was nothing in it, therefore, to warrant the formulating of generic claims. Even in bringing in the interference issues, there was apparently no intention of getting away from the specific. structure declared for; attention being called by counsel, as a reason for their allowance, to the different character of shifting frame from that to be found in No. 470,990, which shows the idea of it at the time, and from which, if such representations are to amount to anything, it should not be permitted to depart. Neither in this application, therefore, any more than the other, if any broad construction is to be given to them, did the claims in question have any place, which effectually disposes of the contention that, being entitled to be brought into either, the inventor had the right to elect which.

Assuming, however, that this is not correct, and does not do justice to the inventor, it is nevertheless conclusive against any broad construction of the present patent that an earlier patent with equivalent narrow claims was allowed to come out, which result the co-pendency of the application for the second was powerless to avert. Not but that this may not sometimes be the case, but only that, under the circumstances, it was not so here. That the claims of the patent in controversy, upon any such reading of them as is contended for, are inclusive of claims 1 and 2 of No. 470,990, there can be no doubt. The only difference between the two sets is their breadth; the one being specific, where the other is not. It was on the strength of this idea that the interference was declared. The later patent thus became a second patenting of the first, which the law does not ordinarily allow. It is not enough that there was a difference in breadth of scope. Miller v. Eagle Manufacturing Company, 151 U. S. 186, 14 Sup. Ct. 310, 38 L. Ed. 121. An inventor may improve or narrow, but not extend. It is contended against this result that both applications were in the Patent Office together, by which the rights of the inventor were saved. It is no doubt true that, where an application in which an invention is expressed broadly is pending at the same time with one upon narrower lines, the taking out of the latter does not preclude the subsequent allowance of the other in broader form. But that, unfortunately, is not this case. Both applications, of course, were pending together; but the one into which the broad claims were eventually brought was the specific and not the generic form, coming in apparently as an afterthought, when the other was already three months out. The interference proceedings having been disposed of on January 21, 1892, there was nothing to prevent the Street claims being made a part of the earlier patent, and, if the inventor was entitled to them, that was the place where it should have been done.

A reissue is ordinarily the only remedy where a patent is found not to be expressive of an invention to its full breadth. An enlargement

of it is not to be effected by the ingrafting of broad claims upon a later patent based upon an application of narrow scope. The authorities relied on by the complainant do not so decide. Undoubtedly there is no double patenting where the broad expression of the invention, although the last to be patented, was granted on an application filed before that for the narrower or specific form. As was well said by Judge Townsend, in Thomson-Houston Co. v. Winchester (C. C.) 71 Fed. 192, the inventor is not to be deprived of his broad patent where the application for it was made first and was delayed in the Patent Office through no fault of his. And Electric Storage Co. v. Buffalo Electric Carriage Co. (C. C.) 117 Fed. 314; Id., 120 Fed. 672, 57 C. C. A. 183, is to the same effect. Nor is there a double patenting, where the later generic patent and the earlier specific one bear a divisional relation, as in Benjamin Electric Manufacturing Co. v. Dale, 158 Fed. 617, 85 C. C. A. 439; the two by virtue of this being in effect one. But not so, necessarily, where one is a continuance of the other, if that, indeed, can be said of what we have here, particularly where the later patent is in terms for an improvement on the other, and conforms strictly to that idea. In the Victor Talking Machine Case (C. C.) 140 Fed. 860, and 145 Fed. 350, 76 C. C. A. 180, the generic patent, although last applied for, was the first to issue, and all that is there said must be taken with this in view. Of course, there was no abandonment by the earlier narrow application in that instance; this not affording any disclosure or surrender of the invention, even though pending for nearly five years. Had the inventor, however, got his specific patent, and later his generic one, it would have presented a very different case.

The question, on the other hand, is squarely decided by the Commissioner of Patents in Jones v. Larter, 92 O. G. 383, where it was held that broad claims inserted in a later application, after a patent had issued on a co-pending earlier one, could not be allowed. "The presumption of dedication to the public by disclosure in a patent," as it is said by the learned Commissioner, "may, it is true, under certain circumstances, be overcome by having a concurrently pending application claiming it; but I know of no authority for holding that it is overcome by an application which does not and was not intended to claim it, merely because the claims are inserted therein long after the patent on the other case issues. In the present case Larter could have made the claims of the issue at any time in his original case, and his failure to do so was, according to his own statement, due merely to a mistake as to his right to such claims. This was clearly a case where the claims could only be properly made by reissue, if at all, and this was the view that Larter took of the matter. He apparently did not think of inserting them in this case until six months after his patent issued, and inserted them then only upon the suggestion of the examiner. It was an error on the part of the examiner to make the suggestion, since to grant the claims in this case would be in effect to grant a reissue of Larter's previous patent with broader claims, and at the same time extend its term."

The present case is not to be distinguished from Morse Chain Co. v. Link Belt Machine Co., 164 Fed. 331, 90 C. C. A. 650. In that case there were two applications co-pending in the Patent Office for over two

years, each being for a specific expression of the same general inventive idea. A patent was granted on the earlier application, and some eight months afterwards a second patent was issued on the other, on which, as here, if construed broadly, as generic, the defendants infringed. This construction, however, the court delined to give. "This is not a case," says Judge Grosscup, "in which a patentee, having first made application for a patent for a generic invention, has subsequently applied for patents for specific improvements. This is a case in which a patentee, possessed of an alleged generic idea, elected to first·apply for a patent for a specific embodiment embracing the essential feature of the generic idea, * * * and later, specifying such essential feature in another specific embodiment, claims that the generic idea growing out of such essential feature belongs to the later, and not to the earlier, patent. To allow this, it seems to us, would be to make the second patent overlap the first, a result that involves the patentee in this dilemma, either that his second patent is not generic in the respect named, or that it is a double patenting."

To the same effect, also, is Otis Elevator Co. v. Portland Co., 127 Fed. 557, 62 C. C. A. 339, where a similar attempt to have the claims of a later patent read broadly, as being generic, in the face of the restricted claims of an earlier patent, the applications for the second being co-pending, was refused, upon substantially the same grounds. The truth is that there is no particular saving grace in co-pendency, independent and apart from other things. Otherwise, the filing of an application for a mere improvement, as here, before the earlier patent comes out, would allow anything to be brought into such application, by way of new and enlarged claims, that experience in the practice of the invention might suggest, which surely is not the law. Without enlarging upon the subject further, therefore, I am constrained to hold that, if the claims relied on in the patent in suit are to be so construed as to embrace the defendants' machine, they conflict with and are anticipated by patent No. 470,990, previously taken out by the same inventor, and are void. It·is only by confining them to the particular character of structure described in the specifications, constituting an improvement, and not an enlargement, upon the earlier patent, that they can be saved. And upon this the defendants do not infringe.

It is also urged that the invention was covered by a British patent to the same inventor taken out in 1891, which ran out by the expiration of its term August 4, 1905, and that this, by Rev. St. § 4887 (U. S. Comp. St. 1901, p. 3382), having become the term of the patent in suit, it had thus expired before the bill was filed. The claims of the British patent were made up from those of No. 457,258 and No. 470,990, mentioned above, some being taken from each, from which the substantial identity of the invention as so patented with that of the two claims of the patent in suit, if construed broadly, would seem to ensue; the greater including the less. But I am on record as holding, in Hennebique Construction Company v. Myers (C. C. A.) 172 Fed. 869, that there was a complete doing away with the interdependence of foreign and domestic patents by the industrial treaty of Brussels of 1900, which treaty was self-executing, and applied to existing patents, and would therefore be effective here. While my opinion was not the opin-

ion of the court, and no point is made of the treaty by counsel at this time, I prefer—the case being otherwise disposed of—to say nothing to in any wise conflict with the views so expressed.

Limiting, then, the construction of the claims relied on, for the reasons given, to a shifting of the type-bar frame by the mechanical means specified in the patent, the defendants' machine does not infringe; or enlarging them beyond this, so that it does, the claims are void for double patenting. Either conclusion is fatal to the right to recover, and the bill must therefore be dismissed, with costs.