**GREENHOUSE v. PLAZA BEVERAGES, Inc. (CROWN CORK & SEAL CO., Inc., Intervener).**

**Civil Action No. 847.**

District Court E. D. New York.

June 30, 1944.

Irving Seidman, of New York City, for plaintiff.

John F. Ryan, of New York City (John J. Darby, of Washington, D. C., William P. Hahn, of Indianapolis, Ind., and Rodger D. Gessford, of Washington, D. C., of counsel), for defendants.

GALSTON, District Judge.

This is a patent infringement suit involving the validity and the infringement of letters patent No. 1,686,811, issued to Samuel Greenhouse, October 9, 1928, on an application filed May 15, 1922, for a bottle-filling machine. The defendant, Plaza Beverages, Inc., is charged as a bottler and user of the method claims; and the defendant Crown Cork & Seal Co., Inc., the intervener, is a manufacturer of bottling equipment used by the Plaza Beverages, Inc.

Though the patent describes the invention as relating to a bottle filling machine, the machine claims are not involved in the suit. The remaining claims, 3 to 10 inclusive, are in issue and define a method for bottling carbonated beverages.

From the specification it appears that the inventor sought to provide a machine which would effect a minimum loss of the gas with which the liquid was to be charged. The inventor claimed as new means for connecting a liquid supply tank to bottles to be filled; means for maintaining the liquid at a certain level in the supply tank, and particular means for automatically limiting fluid pressure in the supply tank.

The specification points out that the use of bottling machines of the prior art caused the bottled liquid to be heavily charged with air; that brewed or carbonated beverages contain a large percentage of vegetable matter which when confined in the presence of this free air causes the beverage soon to lose its flavor; that the presence of the air in the bottled liquid gives the beverage a sharp, unpleasant taste. Accordingly among other objects sought, Greenhouse endeavored to provide a machine which would "deaerate" the liquid without removing any substantial amount of the gas. The means proposed centered largely about the provision of a fluid pressure control valve. The specification recites:

"In using my improved device, the valve 22 is adjusted to operate at the pressure required within the tank, the continued operation of the machine causes air and gas to constantly escape from the liquid within the filling chamber so that the air and lighter gases are constantly escaping through the valve 22. Inasmuch as the valve 22 is in constant operation, the volume of air or gases passing through the valve 22 is relatively small causing no disturbance in the tank, the gas being heavier than the air forms in a strata just above the liquid and is easily forced into the liquid by the pressure within the tank to replace the air and lighter gas, thus eliminated therefrom."

The defenses to the patent assert invalidity on a number of grounds. The first of these to be examined is alleged prior knowledge and prior use of the claimed method by the Liquid Carbonic Corporation and purchasers of its beverage filling machine. The proof concerning the construction and operation of this machine, illustrated in Exhibit 25, and described in various charts and catalogues issued by the Liquid Carbonic Corporation, beginning as far back as 1916 and continuing to 1922, was painstakingly and elaborately adduced through the taking of the depositions of many witnesses as well as by witnesses at the trial. They included various users as well as employees of the Liquid Carbonic Corporation. This early machine and its use were established by such clear and convincing testimony as to meet fully the required test in respect to the weight of the evidence required to prove prior use.

It will not be necessary to recite in detail the testimony of these many witnesses. Suffice it to say that the machine in question was manufactured and used during the period indicated; also that the machine was always provided with a petcock at the top of the filler tank which permitted a constant escape of air and gas from the tank. In addition the proof discloses that the purchasers who were engaged in the bottle filling industry were instructed to leave the petcock open during the operation of the machines. At the trial I was much impressed by the testimony of Schmutzer. He operated two of the Liquid Carbonic Corporation machines in Pittsfield in 1919, when he was employed by the Great Radium Company of that city. He confirmed other users by

saying that he had been instructed to leave the petcock open during the operation of the machines, and that he always had done so. During the operation of the machines there was, in consequence, he observed, a continuous flow of gas through the petcock. He explained that by stating that "because once the cock was opened there is always 25 to 50 pounds pressure inside the machine; every time the machine turns around,* the petcock also blows in my face and I could feel it, but so long as the petcock was open and nobody shut it, it had to blow, because there was a higher pressure inside than outside."

The early form of the Liquid Carbonic Corporation machine followed generally the type described in Patent No. 938,577, issued to Gull, November 2, 1909. It is interesting to note that in that specification it is said:

"As the level of the beer in the tank is supposed to be kept at a practically uniform height, it depends, therefore, entirely on the regulation of the air pressure within the bottle when the flow of the beer into the bottle will come to a stop. To accomplish the desired regulation of the gaseous pressure within the bottle, I use a body of liquid to balance the supply of air to the bottles, and by keeping this body of liquid under the same gaseous pressure as the beer in the tank, it is the height of this body of liquid pressing on the air supply to the bottles which determines the difference in pressure between the gaseous pressure in the bottles and the gaseous pressure on the beer in the tank."

The Liquid Carbonic catalogue, dated July 1, 1920, on the subject of constancy of pressure within the tank, contains this explanation:

"Thus the water in the tank 'H' is automatically held at a pre-determined level, and the air from the filled bottles is discharged to the atmosphere. Also the pressure on the tank 'H' is held at 25 pounds, or any pressure desired, by adjusting the Reducing Valve 'E' and Air Regulator."

From the foregoing I conclude that the construction of the earlier Liquid Carbonic machine permitted a constant discharge from the petcock and that the method employed in the operation of the machine effectuated such a result; also that such early machine maintained a substantially constant liquid level, as well as a constant pressure in the filler tank. Whatever variation there was in the water level in the filler tank was inconsequential, apparently the variance not being more than a quarter of an inch, an allowable operational variation.

Considering Claim 7, for example, as perhaps the broadest of the claims in suit, it is seen that the use of the early Liquid Carbonic machine, when used, is a clear anticipation. The claim reads:

"That method of bottling carbonated beverages which consists in first maintaining a body of carbonated liquid in an enclosed chamber, causing a continuous escape of air from the top of said chamber and withdrawing the carbonated liquid from the bottom of the chamber."

Claims 4, 5, 8 and 9 are narrower claims, which introduce the conditions of uniformity of liquid level and constant pressure in the filler tank. Claim 8, for example, reads:

"That method of bottling a carbonated liquid which consists in partly filling an enclosed space with the liquid, filling the upper part of the space with gas under pressure, causing gas to continuously escape from the upper part of said space, constantly replenishing the gas thus escaping, drawing the carbonated liquid from the bottom of said space and constantly replacing the amount of liquid withdrawn."

The method defined in this claim is likewise anticipated by the use of the early Liquid Carbonic machines.

For the same reasons I conclude that Gull Patent, No. 938,577, heretofore referred to, likewise anticipates the claims in suit. This patent is for a process of bottling beer and, as has been said, describes the machine which was manufactured and sold by the Liquid Carbonic Corporation.

The specification includes this passage:

"Back pressure of gas from the bottles passes through the supply pipes into the ducts 24, 25 and 26, and thence down through the tubes into the liquid from whence it passes up through the liquid in the tank 20, and any excess of air pressure that is formed in the upper part of the tank 8 above the beer will pass out through a suitable vent cock such as is shown on the right hand side of Fig. 1 of the drawings."

---

* The filling apparatus was of a revolving type.

In addition to the anticipation of the Greenhouse method, the defendant urges that the patent is invalid for lack of invention, with particular reference to Colby Patent, No. 755,619; Meadowcroft British Patent, No. 3679 of 1912; Champ Patent, No. 956,285; Champ Patent, No. 956,286; Henes Patent, No. 1,166,520; and patent to Friedman, No. 648,864.

Defendant concedes that none of these patents specifies a continuous escape of air from the filling tank, but urges that such continuous escape produces no new result. The Greenhouse file wrapper shows that he argued that Colby's intermittent discharge from the relief valve 22 resulted in a waste of gas. I think the evidence in this respect is unconvincing. Both parties conducted tests; the plaintiff for the purpose of showing that with constant escape the air forms a stratum just above the liquid in the filler tank, and the defendants to show that with such constant escape there is no more concentration of carbonic acid gas immediately above the liquid than with intermittent escape, and that Greenhouse's stratification theory, set forth in his specification, lines 60 to 75, page 3, is unfounded.

Neither set of tests afforded convincing support of either theory. For one reason, they were insufficient in number, and secondly the circumstances surrounding the tests were not such as to justify any scientifically certain conclusions. During the trial the court inquired of Dr. Sharf, an expert chemist testifying on behalf of the defendant, whether it would not be desirable, for the purpose of attaining a scientific conclusion, to have tests made not at one or two plants, but at a dozen or more, to ascertain whether the principles involved in the invention are supportable. The witness said:

"I would agree with that, sir. Many of us tend to be too ambitious in our scientific interpretation of data, and it is only over a period of time and with a large number of samples that we can approach true conditions."

The witness also admitted that there are varying conditions found in these bottling plants.

Granting, however, that constant discharge is desirable, whether Greenhouse contributed substantially to the art over the intermittent discharge of Colby, is to be doubted.

It is true that in the challenged improved device of the Liquid Carbonic Corporation, which is used by the Plaza Beverages, Inc., a gas saving is effected. So much indeed appears in one of the advertisements of the Liquid Carbonic Corporation, but it is not true that such saving was proved to result from the means described by Greenhouse in his patent. In the Liquid Carbonic machine which has been manufactured since 1926 we find two variations from the earlier machine: one, the provision of a spring loaded escape valve to replace the petcock; and two, the use of a diaphragm gas controlled valve instead of the reducer valve of the earlier form. A saving of gas is materially effected by the substituted improvement.

It must be observed that these earlier patents of the prior art taught a great deal. For example, in the Colby bottling machine patent we find the statement that his relief valve 22 is of the ordinary safety valve type, "which might be set to blow off or relieve the pressure at any predetermined point."

There is also a float valve provided, which floats in the beer and closes the valve, holds it closed when the beer is at a certain height, and maintains the level of the beer during the operation of the machine. Insistence is made on "maintaining the beer in the reservoir, always at a certain pre-determined level." Provision is made too so that the initial pressure in the reservoir is always maintained.

British Letters Patent No. 3,679, of 1912, to Meadowcroft, is for an improvement in bottling apparatus for aerated waters. Among other things provided for in this apparatus is a float valve within the cylinder for the control of the inlet of gas from the top of the aerating or carbonating cylinder. There is reference made to a sniffer or release valve for the purpose of allowing the gas "to escape into the atmosphere, carrying with it the air which was in the empty bottle and leaving the bottle full of gas only owing to its being heavier than air."

Patent No. 956,285 to Champ, issued April 26, 1910, also for a bottle filling machine, describes a means, in Fig. 40, for maintaining proper pressure of the beer in the beer tank. There the tank is shown provided with a ball float, with attachment for control by means of a vent cock, a [6]. This, as has been indicated, is not an automatic contrivance.

The specification of Champ Patent, No. 956,286, refers to automatic means for maintaining conditions of desired relative pressure within the tank. The specification reads:

"When the machine is first started, the cock 17 is opened and the cock 16 closed. But, after the machine is started, such cock 17 is closed and the cock 16 opened; thereby causing the pressure of the air on the top of the beer in the beer tank to ·be the same as the pressure of the air on the top of the diaphragm 12, within the diaphragm chamber 8."

Patent to Henes, No. 1,166,520, issued January 4, 1916, for a bottle filling machine, recites that the "liquid is automatically maintained under gas pressure at a pre-determined and substantially constant level."

Patent to Friedman, No. 648,864, May 1, 1900, for a bottle filling machine, discloses a double float valve of the charging chamber. The specification states:

"Any tendency of the air or gas pressure to become too great will immediately be checked by reason of the falling of the level of the beer, causing the lowering of float 105 * * *. This action is instantly followed by the reduction of pressure in the charging chamber * * * and immediately following the reduction of pressure the beer rises in the chamber to be checked by the opening of Port 98 and closing of Port 100 through the action of the double float valve * * *. By this mechanism the levels of pressure of the beer in the charging chamber are maintained uniform."

Thus, in view of these prior art patents, the Greenhouse method discloses no invention. It would not seem a matter of invention, but rather the subject of mechanical skill to substitute in the known prior art automatic means for manually controlled means, conceding the advantage of the former. Nor is there anything in the claims in suit which covers the use of an adjustable automatic valve.

The finding that the Greenhouse patent is invalid both because of anticipation and want of invention renders unnecessary a finding in respect either to the matter of infringement or the defense of laches, which has been asserted in behalf of the Plaza Beverages, Inc. In passing, however, I may say that I believe that if the claims were held valid, then there is infringement, and though laches would be a sound defense in behalf of the Liquid Carbonic Corporation, if it were a party, there is no authority for holding that such defense is available to a defendant who purchased a machine from the Liquid Carbonic Corporation, and to whom no notice of alleged infringement was given until this suit was instituted.

The defendants may have a decree dismissing the complaint. Appropriate findings of fact and conclusions of law will be filed with this opinion.