**PIERCE v. AMERICAN COMMUNICA-
TIONS CO., Inc. et al.**

Civ. No. 51–526.

United States District Court
D. Massachusetts.

March 19, 1953.

182

Rines & Rines, David Rines and Robert Rines, Boston, Mass., for plaintiff.

Dike, Thompson, and Sanborn and Robert L. Thompson, Boston, Mass., Paul Kolisch and J. Pierre Kolisch, New York City, for American Communications Co., Inc.

FORD, District Judge.

Plaintiff in this action alleges infringement by the defendant of his United States patents No. 2,133,642, No. 2;133,643, No. 2,133,644, No. 2,133,645, No. 2,133,646, No. 2,133,648, and No. 2,266,070.

Defendant American Communications Company is a Massachusetts corporation doing business in this district, which leases and uses in its business certain radio transmitting and receiving equipment which is alleged to infringe the patents in suit. Federal Telephone and Radio Corporation (hereinafter called Federal), named as a defendant, is a Delaware corporation doing business in New Jersey. It is the manufacturer and lessor of the accused radio equipment. It has not been served here and has declined to appear voluntarily in the action.

Plaintiff has moved for a preliminary injunction against the alleged infringement. Both parties have filed motions for partial summary judgment as to certain claims of Pierce patent No. 2,133,642, which is the basic patent of the group involved in this action.

Ordinarily the issues in a patent case are such that it is inappropriate to pass upon the question of the validity of the patent without hearing testimony from the experts called by the parties. In this case, however, both sides have filed voluminous exhibits and affidavits of experts in support of their respective motions, and both parties are agreed that these present all the evidence which could be adduced. Oral evidence from these experts would involve only a time-consuming repetition of what is already before the court in documentary form. The case, therefore, is one in which it is proper to proceed to a decision on the motions for summary judgment and the motion for a preliminary injunction without the taking of oral testimony. Meikle v. Timken-Detroit Axle Co., D.C., 44 F.Supp. 460, 461.

Patent No. 2,133,642 for an electrical system relates particularly to the use of a piezoelectric crystal for producing and sustaining at a constant frequency the oscillations of such a system. While there are applications in other fields, the primary importance of the patents in suit is in the art of radio broadcasting.

The carrier waves by means of which radio communication is carried on are generated from the transmitter by an alternating current of electricity flowing in and out of an antenna consisting of a wire or wires suspended in the air. When this current alternates or oscillates at a high frequency of thousands up to millions of cycles a second, radio waves of corresponding frequency and intensity are produced. A broadcast on waves of any given frequency can be picked up by a receiver in which a corresponding electrical circuit has been tuned or adjusted so as to be responsive to waves of that particular frequency. It is important that the frequency of the waves sent out from a transmitter should remain constant. Communication is possible between sender and receiver only so long as both remain tuned to the same frequency. Moreover, a transmitter which varies from its proper frequency will interfere with stations transmitting on other frequencies, while the more closely stations adhere to their proper frequencies the greater the number of stations which can be assigned broadcast frequencies without danger of interference.

In the earlier days of radio several different devices such as spark gaps, electric arcs, or mechanical generators were used to produce the alternations or oscillations in the electrical circuit of a transmitter. A significant development came in 1912 with de Forest's discovery that the thermionic vacuum tube or triode could be used to generate oscillations of the high frequency useful for radio broadcasting. Such tubes were used in circuits containing one or more condensers and one or more inductance coils. By adjusting a variable condenser to change the capacitance of the circuit (or, less frequently, by adjusting a coil to change the inductance) these circuits could be tuned to oscillate at the desired frequency. However, due to such factors as the running down of batteries, or the change in inductance and capacitance caused as the elements of the circuit became heated when in use, there was still an undesirable amount of variation in frequency.

The problem of maintaining the oscillations of the circuit at constant frequency was solved by the use of piezoelectric crystals. These are crystals of certain substances, such as quartz, tourmaline, and Rochelle salt (sodium potassium tartarate). When the opposite terminals of a battery or other source of direct current are applied to two particular surfaces of such a crystal it undergoes a mechanical deformation, i. e., it contracts or expands in some dimension or becomes twisted. Conversely when a mechanical force is applied to squeeze or stretch or twist the crystal, electrical potentials of opposite sign are built up on the opposing surfaces of the crystal. When an alternating voltage from an oscillator or other source is applied to the crystal it is deformed first in one direction, then in another as the current alternates and thereby the crystal is caused to vibrate.

The piezoelectric properties of these crystals were first noted by Jacques and Pierre Curie in 1880 but for many years no practical application was made of them. During World War I a French scientist, Professor Paul Langevin, found a use for these crystals in devices for submarine detection and for ship to ship communication by means of waves propagated through the water. The communication of his discoveries to British and American scientists engaged in war-time research stimulated further study of these crystals. Pierce, a physics professor at Harvard University, was one of these scientists, and another was Professor Walter G. Cady, of Wesleyan University. Cady is generally recognized as the pioneer in the use of piezoelectric crystals in oscillating circuits, and admittedly it was Cady's work which drew Pierce's attention to the possibilities of their use in that field. The results of Pierce's work he embodied in a paper published in the "Proceedings of the Amer-

ican Academy of Arts and Sciences" in October 1923, which attracted wide attention among scientists at the time. These researches also formed the basis for his patent application of February 25, 1924, from which as a result of a later division of the application, the patents in suit·were derived.

This summary of the background · of Pierce's patent application leads to the consideration of the defenses on which defendant here relies: invalidity, non-infringement, double patenting, and laches.

## Validity.

Defendant contends that the Pierce patents are invalid for lack of invention over the discoveries of previous researchers in the field and particularly of Nicholson and Cady. The Pierce patent No. 2,133,642 teaches the use of a piezoelectric crystal inserted into an oscillating electrical circuit to control the frequency of the oscillations. The crystal used by Pierce is not the whole natural crystal but a thin slice or plate cut from the whole crystal. It it incorporated into the circuit by being connected on opposite surfaces to two electrodes. As Pierce shows it, the crystal is encased in a small box, resting on the bottom which is made of conducting material with a binding post attached so that it serves as one electrode, while the other electrode is a threaded binding post screwed through an opening in the insulating cover of the casing until it comes into contact with the upper surface of the crystal.

This crystal is connected into one of the circuits of an electrical system having a vacuum tube. Pierce teaches that it may be connected into any of the three circuits which form the system, i. e., the input circuit (between the filament and the grid) the output circuit (between the filament and the plate) or the mutual circuit (between the grid and the plate). The incorporation of the crystal into one of these circuits makes the system oscillatory, the other elements being such that if the crystal is removed from the circuit the generator will not oscillate at all. Moreover, the oscillations are controlled by the crystal, so that the frequency of the oscilla-

tions is maintained substantially constant at a frequency determined by the natural frequency of one ·of the modes of vibration of the crystal. Variations in the other elements which would cause changes of frequency in the prior art oscillators no longer have that effect. If the system oscillates at all, it does so at the rate determined by the natural frequency of the . crystal.

Pierce was not, of course, the first to connect a piezoelectric crystal into an oscillating circuit or to use it to establish some control over the frequency of the oscillations. It is the contention of defendant that the teaching of the Pierce patents was already disclosed in the work of Nicholson and Cady, and that the accomplishment of Pierce was merely a simplification of the system of ·Cady which was within the power of one skilled in the art.

The Nicholson patents No. 1,495,429 and No. 2,212,845 for piezophony disclosed the use of a whole Rochelle salt crystal connected into the input circuit or into both input and output circuits of an oscillating vacuum tube electrical system. Outwardly the arrangement looks like that of some of the circuits shown by Pierce. The purpose and mode of operation of the crystal in the Nicholson circuits shown in his earlier patent is entirely different. The crystal is provided with a surface adapted to be vibrated by the sound waves impinging upon it. This causes a variation in the pressure exerted upon the crystal. Pressure on a piezoelectric crystal generates electric potentials of opposite sign on opposite surfaces of the crystal, and the variations in this pressure produce corresponding variations in the strength of these electric potentials. The result is a modulation of the oscillations, i. e., a variation in their amplitude or intensity corresponding to the pattern of the sound waves. Nicholson shows only the use of the crystal as the equivalent of a telephone transmitter or a microphone. He teaches nothing about the control of the frequency of the oscillations. Beyond superficial resemblance of the position of the crystal in the circuit, there is nothing in this Nicholson patent which anticipates Pierce's teach-

ing as to control of the frequency of oscillations by the crystal.

The later Nicholson patent No. 2,212,845 shows a single figure which is almost exactly the same as Fig. 11 of his earlier patent. As the specification states, this patent was granted on a division of the application for the earlier patent, filed on April 23, 1923. It does claim to disclose an oscillator whose frequency is crystal-controlled. Claims embodying this aspect of the Nicholson circuit were, however, added only after Cady had made his disclosures to be discussed below. Nicholson still shows the same whole Rochelle salt crystal of his earlier patent, with three electrodes arranged so as to operate as two pairs of electrodes. In this the crystal resembles more closely the four-electrode crystal of Cady than the two-electrode crystal of Pierce. The Pierce oscillator is so designed as to oscillate only at the frequency determined by the crystal, the presence of which is necessary if the system is to oscillate at all. Nicholson, on the other hand, while claiming that his system may oscillate at a frequency determined by the natural frequency of the crystal and under the control of the crystal, is also careful to point out that by proper use of reactances it may also be made to oscillate at some other frequency than that determined by the crystal. Clearly, this does not purport to be the same thing as the Pierce oscillator. Indeed it appears that although Nicholson may have believed he had a crystal-controlled oscillator, in fact he did not. Professor Cady showed by his later experiments with the Nicholson circuit that oscillations were not controlled by the crystal but were determined by the other elements of the circuit. The evidence of Professor Edward L. Bowles' affidavit is to the effect that the function of the crystal in the Nicholson circuit is to modulate the oscillations (the only function he originally claimed for them, and the basis for his earlier patent) and not to control their frequency.

Defendant has introduced pages from Nicholson's note book written in 1918, containing diagrams from which it argues that in 1918 Nicholson had already hit upon the circuit which Pierce later patented. But these only show that in 1918 he was working on circuits which may superficially resemble that of Pierce, as do those, for instance, of his earlier patent, which, however, discloses only a different function and mode of operation of the crystal. Dr. F. W. Kranz, who signed these pages as witness, testified that Nicholson at that time said nothing to indicate he had discovered that crystals could be used to control the frequency of the oscillations, nor did Nicholson make any such claim when he originally filed his application in 1918. These pages furnish no warrant for a conclusion that Nicholson in 1918 had anticipated what Pierce was later to discover.

The contribution of Cady to the use of crystals for the control of oscillations is shown in the Cady patent No. 1,472,583 and the Cady reissue patent No. Re–17,245. In these patents Cady discloses the use of a piezoelectric crystal in conjunction with two well known prior art oscillating systems. In Figs. 1, 3, and 4, the use of such a crystal in connection with the already well known Armstrong oscillator is shown. Various ways are shown in which the crystal may be incorporated into a circuit or circuits of this system. The crystal is simply an element added to an already existing oscillatory system, which will oscillate either with or without the presence of the crystal. The frequency at which the system oscillates is determined primarily by the electrical characteristics of the other elements of the system and in general it varies as they vary, whether or not the crystal is present. The only effect produced by the crystal, and the substance of what Cady describes as his invention, is that within a certain narrow range of variation of the other elements of the system the frequency of the oscillations is stabilized at a constant rate. Within this range the crystal holds the frequency constant regardless of small variations in the other elements of the system. But when the other elements are varied to a greater extent, the system continues to oscillate, but at a rate determined by these other elements, and not subject to any control by the crystal. Undoubtedly

this was a pioneering step in the field, but it is a far cry from this to what Pierce later did. Pierce showed that the crystal need not merely be added to the elements of an already existing system, but could be substituted for a tuned circuit in such a system. Pierce's crystal did not merely stabilize the frequency within a limited range, but held it constant at a fixed point, regardless of changes in the other elements of the system. These changes might be so extreme as to render the system non-oscillatory. However, if it oscillated at all, it did so at the frequency determined by the crystal. Moreover, the presence of the crystal was essential to the oscillations, so that if the crystal were removed, the system would no longer oscillate.

Cady's Fig. 2 shows a different form of oscillator in which the piezoelectric crystal does control the frequency of the oscillations. But this oscillator still is far from what Pierce later revealed. Cady's oscillator required the use of an amplifier consisting of three vacuum tubes, as against the one in the Pierce oscillator. More important, the mode of operation of the crystal in the Cady oscillator was different. The crystal in Cady is a relatively long plate equipped with four electrodes, a pair at either end. One pair of these electrodes was connected in the output circuit of the amplifier, so that changes in potential would set the crystal vibrating. These vibrations would be transmitted mechanically through the length of the crystal to the other electrodes, where the mechanical vibrations would result in corresponding variations in potential in the input circuit of the amplifier into which the second pair of electrodes was incorporated. The crystal thus operates to maintain the oscillation of the system by furnishing a means for the mechanical transfer of changes in potential from one circuit to another. Four electrodes were necessary since the crystal operated by making the transfer of energy mechanically from one set of electrodes to another. The dimension of the crystal utilized had to be large enough to permit the attachment of four electrodes. Since the greater the dimension of the crystal used, the lower is the frequency of vibration of the crystal, the Cady oscillator with the four-electrode crystal was useful only at low frequencies, and, unlike the Pierce oscillator, could not be used to control the high frequency oscillations which are particularly useful in the radio field.

Not only does Pierce show an advance over Cady but it is an advance which is more than the simplification or improvement which would be within the capabilities of a worker skilled in the art and familiar with the disclosures of Cady. Cady admits that he was unable to simplify his three tube oscillation generator, and that it was not until after Pierce's discovery that Cady's assistant, Professor Karl S. Van Dyke, finally succeeded in getting it to operate with only a single tube. As has been pointed out, Pierce's use of the crystal resulted in a different mode of operation and produced a different result. Cady himself recognized the achievement of Pierce, not only now when his patents have expired, but from the time of the first disclosure of Pierce's work in 1923. Pierce's work has received widespread scientific recognition. The exhibits contain numerous citations to scientific and technical works in which the name "Pierce circuit" is used to designate one form of the circuit disclosed by the Pierce patent, and sometimes the term "Pierce-Miller circuit" is used for another form thereof. (The "Pierce-Miller circuit" is the form having the crystal in the grid-filament circuit, as shown in Pierce's Fig. 11 and in Miller's patent No. 1,756,000. Cf. Miller v. Pierce, 97 F.2d 141, 25 C.C.Pa., Patents, 1195 and Miller v. National Broadcasting Co., 3 Cir., 79 F.2d 657, holding Pierce and not Miller the prior inventor of this circuit.) The Pierce patent has enjoyed great commercial success, and piezoelectric crystals are in common use to control the frequency of radio transmitting and receiving apparatus. Licenses under the Pierce patents have been taken out by the United States government, and by most of the leading manufacturers of radio equipment, including such large manufacturers as Westinghouse, General Electric, Radio Corporation of America, and American Telephone and Telegraph Company. These

facts do not in themselves, of course, constitute conclusive proof that the work of Pierce amounted to invention, but they do give strong support to such a conclusion drawn from the basic differences between the developments made by Pierce and the work of his predecessors.

Defendant's expert, Professor William A. Edson, takes the position in his affidavit that given the disclosures of Cady, any one skilled in the art could readily have done what Pierce did. His conclusion is weakened by the fact that numerous experts in the field were actively searching at that time for a better method of controlling the frequency of electric oscillating systems, including the United States Navy, the engineers of American Telephone and Telegraph Company and its associated companies and numerous independent scientists. No one of them, however, not even Cady himself, was able to make the step until Pierce revealed his solution.

Pierce, in summary, made a distinct and useful contribution to the art of radio broadcasting. His work was a significant advance over what had been done by his predecessors, and not a mere simplification of what they had disclosed to the art. His discovery not only won him immediate scientific acclaim, but it has proved of enduring commercial importance in the radio field up to the present time. The argument that the Pierce patent is invalid must be rejected.

### Infringement.

The alleged infringing devices are the transmitters and receivers of Radio Equipment FT–145–10A, FT–149–30AZ, and FT–125–B25A, manufactured by Federal and leased from it by defendant and used commercially by defendant in the carrying on of its communication service. These are alleged to infringe the claims of the Pierce patent involved in the present motions. The characteristics of the circuits of these pieces of equipment appear from the affidavit of plaintiff's expert Bowles who studied the manufacturer's manuals for these radio sets, prepared simplified diagrams showing the particular circuits which are alleged to infringe, and also examined at defendant's place of business sets actually being used by defendant.

In all of these radio sets a piezoelectric crystal is employed for the purpose of maintaining the oscillations of an electrical system at a constant frequency. There is a vacuum tube containing a filament, plate, and grid. The crystal is connected into one of the circuits linked with this tube. In the transmitter of set FT–125–B25A it is connected in the mutual circuit, i. e., between the plate and the grid. In the transmitters of the other two sets, and in the receivers of all three sets, the crystal is connected in the input circuit, i. e., between the filament and the grid. In all of these sets there is an oscillation generator in which is found a three-electrode vacuum tube, a piezoelectric crystal in circuit between two of the electrodes of said tube, and a tunable resonant output circuit containing an inductance and capacitance in parallel, the circuit being tuned to a higher period of frequency than the natural frequency of the crystal, so that when the system is in operation it will produce oscillations at a constant frequency determined by the natural frequency of the crystal. Thus, except for the transmitter of FT–125–B25A, these sets clearly infringe all of the claims at issue in the present motions—51, 52, 54, 55, 56 and 61 to 68. The oscillating system in these sets is in fact substantially the same system as that shown in Fig. 11 of patent No. 2,133,642. The transmitter of FT–125–B25A, having a grid-plate connection of the crystal, such as is shown in Fig. 2 and Fig. 3 of patent No. 2,133,642, infringes claims 51, 52, 55, 61, 64, 67 and 68, but not the other claims at issue here, since they specifically call for a grid-cathode connection of the crystal.

The various objections urged by defendant do not invalidate this conclusion. It is true that defendant's sets are complicated pieces of radio equipment containing many components not found in Pierce and in many cases developed long after Pierce's invention. Pierce did not claim a complete radio set, but only a specific kind of oscillation generator with a crystal-controlled frequency capable of being used as one component of a radio set. The essential fact

is that each of these infringing sets has an oscillatory system which is substantially the crystal-controlled oscillator disclosed by Pierce. They, therefore, infringe the Pierce patent regardless of the improvements in other parts of the set introduced because of later developments in the radio art.

The fact that each of the accused sets has a trimming condenser in the input circuit does not negative infringement. Such a condenser does not make a substantial change in the control of the frequency by the crystal, but is only for the purpose of making a final highly precise adjustment of the frequency. Pierce himself pointed out the possibility of such a final adjustment where extreme precision of frequency was required.

The objection that the accused devices do not contain a tunable circuit is refuted by the evidence of Professor Bowles, who points out that the sets are in fact tunable, and that service manuals published for them contain instructions for the making of a final adjustment or tuning before the set is actually put into use.

The vacuum tube used in defendant's sets is not the simple triode used by Pierce, but a more modern tube, either a double triode or a penta-grid converter. But this simply means that for electrical convenience and the saving of space it is now possible to make vacuum tubes containing the elements used by Pierce and also other elements having other uses in the radio set. These tubes have a filament, grid and plate working in just the same way and serving just the same purpose in the oscillation generator as did the filament, grid and plate in the tubes used by Pierce, regardless of the fact that they are enclosed in the same envelope with other electrical elements. Likewise it makes no substantial difference that defendant's tubes have the filament heated indirectly, rather than directly by a current from a battery passing through the filament. Pierce did not claim to invent the vacuum tube or the vacuum tube oscillation generator. His invention consisted in the use of the crystal in connection therewith to control the frequency of the oscillations. It is no defense to infringement that defendant's tubes are more modern and more complex, since so far as the oscillatory system of the accused sets is concerned the vacuum tubes used are the exact electrical equivalents of the tubes used by Pierce.

## Double Patenting.

The defense of double patenting is based on patent No. 1,789,496 issued to plaintiff Pierce in 1931 for a radio transmitting and receiving system in combination having a means of keeping the oscillations of both the transmitter and receiver at the same constant frequency. Claims 1 and 2 specifically mention the use of a piezoelectric body for controlling the frequency of these oscillations. The specification describes the use in the claimed combination of a piezoelectric crystal for the control of the frequency of oscillations in the same manner in which the use of such a crystal is disclosed in patent No. 2,133,642.

The original Pierce patent application serial No. 695,094 was filed on February 25, 1924. It included not only general claims for the use of a piezoelectric crystal to control the frequency of an oscillating system but also (Claims 53, 54, and 57) specific claims for the combination of a radio transmitter and receiver in which such crystals could be used. The Patent Office, holding that more than one invention was described in the application, ordered a division. In compliance with this order Pierce, on January 18, 1928, filed several divisional applications. On one of these, serial No. 247,469, patent No. 1,789,-496 was issued on January 20, 1931. This application was expressly described as a division of co-pending application serial No. 695,094, to which reference was made for a fuller explanation of the properties of piezoelectric crystals. The original application was allowed on September 3, 1929, but was forfeited for failure to pay the required final fee. Thereafter, it was renewed on April 18, 1930. On September 21, 1932, an interference between Pierce and Miller was begun which was not finally decided until June 6, 1938. Miller v. Pierce, supra. Thereafter, on October 18, 1938, the Pierce patent No. 2,133,642 was finally issued on the original application.

██ An inventor cannot validly obtain two patents on precisely the same invention, and where he does have two such patents, the second to be issued is void, since it would extend improperly the duration of his patent monopoly. But to render the second patent invalid it is essential that the invention covered by both patents be the same. Hence, the charge of double patenting cannot be sustained where the first of two patents to be issued on co-pending applications is for an improvement upon the basic invention on which the later patent is issued, Thomson-Houston Electric Co. v. Ohio Brass Co., 6 Cir., 80 F. 712, 724; or where the first is for a narrow or specific form of what is claimed broadly or generically in the second, Union Typewriter Co. v. L. C. Smith & Bros., C.C., 173 F. 288, 297; or where one is for a specific combination which includes as one of its elements the subject matter of the second, In re Carlton, 77 F.2d 363, 365, 22 C.C.Pa., Patents, 1223.

██ In this situation, Pierce's two patents are not for the same invention. The Patent Office Examiner considered that the original application described distinct inventions, and hence compelled him to divide his application. This decision of the Examiner "should not be lightly overruled." In re Cady, 77 F.2d 106, 109, 22 C.C.P.A., Patents, 1190. It is supported by a consideration of the subject matter of the two patents. No. 2,133,642 is for the basic invention, the use of a piezoelectric crystal to control oscillation frequency. Its claims extend broadly to any oscillation generator, whether designed for use in the field of radio broadcasting or for some of the other possible uses of such generators. No. 1,789,496 is confined to the radio broadcasting field and claims narrowly only a specific combination of transmitter and receiver, in which the piezoelectric crystal disclosed by the later issued patent may be an element. It is not necessarily an element, since claim 3 is not confined to the use of the crystal of No. 2,133,642 but calls only for the use of some form of electro-mechanical vibrator to control the frequency.

██ Pierce here finds himself in a situation where his patent on his basic invention is attacked because as a result of his being compelled to divide his original application and because of delays caused by interference proceedings, his basic patent was not issued for over seven years after the issuance of a patent for a particular improvement embodying that idea. In such a case the inventor should not be penalized for a situation arising in the first place from Patent Office rules to which he had to conform. Once he has succeeded in getting patent protection for his basic invention he should be entitled to enjoy that protection for the full period allowed by the law. General Electric Co. v. P. R. Mallory & Co., 2 Cir., 298 F. 579, 584; Badische Anilin & Soda Fabrik v. A. Klipstein & Co., C.C., 125 F. 543, 554.

### Laches.

In support of its defense of laches, defendant cites the long history in which this patent has been involved. The original application was filed in 1924 and the patent at issue here did not finally issue until 1938. In 1930, International Telephone & Telegraph Company, with which Federal is affiliated, refused to take a license from Pierce. There was evidence that in 1938 and in 1941 counsel for plaintiff was told that plaintiff's patents were being widely infringed, and counsel, on July 22, 1941, wrote to numerous manufacturers, including Federal's predecessor, charging them with infringing Pierce's patents. No suit, however, was ever brought against any alleged infringer of any of the Pierce patents in suit until the present action was commenced in June of 1951. On the basis of these facts, it is contended that Federal would have a good defense of laches against plaintiff, and defendant argues that as a lessee of Federal it is entitled to assert that defense.

On the other hand, plaintiff argues that in 1930 International Telephone & Telegraph's refusal to take a license was stated to be on the ground that they did not intend to use the Pierce circuit; that from 1941 until at least 1945 plaintiff was justified in not bringing any action against infringers because such suits would interfere with the war effort by drawing experts away from vitally important war work; that Federal's

production of radio equipment was entirely for the use of the United States during the war years, and in large part for the use of the United States thereafter, and that if such equipment did use the Pierce circuits, it did not infringe since the United States was a licensee of Pierce; that Pierce brought this action on information and belief and did not definitely know until after the bringing of the action that his patents were being infringed; and that Federal since 1941 assured plaintiff's counsel that it was not infringing the Pierce patents, but refused to furnish counsel with detailed and complete circuit diagrams or permit him to examine its radio sets so that he might satisfy himself as to whether his suspicions of infringement had a sound basis in fact.

 It is not necessary here to decide whether Federal would have a good defense of laches; since Federal is not in fact a party to this action. The defense of laches is one personal to a defendant and arises out of the personal relationship between defendant and plaintiff. Defendant here as lessee of infringing equipment cannot assert laches as to its lessor, the manufacturer of the equipment (if indeed plaintiff is guilty of laches), as a defense to its own violation of plaintiff's rights. Salem Engineering Co. v. National Supply Co., D.C., 75 F.Supp. 993, 1000; Greenhouse v. Plaza Beverages, Inc., D.C., 55 F.Supp. 891, 895; Caterpillar Tractor Co. v. International Harvester Co., D.C., 32 F.Supp. 304, 308; Perry v. Reeves Steel & Mfg. Co., D.C., 8 F.R.D. 318. In some of these cases, it is true, the exact point decided was that the manufacturer of the allegedly infringing device, having been allowed to intervene in an action against its vendee, could not set up laches against itself as a defense. But the rationale of these decisions was that the intervenor was barred from raising any issue not open between the original parties. Chandler & Price Co. v. Brandtjen & Kluge, Inc., 296 U.S. 53, 57, 56 S.Ct. 6, 80 L.Ed. 39. Hence, it was necessarily implied that in these cases the original defendant could not have relied on laches as against the manufacturer.

 Hence, defendant, to establish its defense, must show that plaintiff failed to show reasonable diligence in asserting its rights against defendant itself, and, also, of course, that defendant has been prejudiced by this delay. Galliher v. Cadwell, 145 U.S. 368, 372, 12 S.Ct. 873, 36 L. Ed. 738; B. F. Sturtevant Co. v. Massachusetts Hair & Felt Co., 1 Cir., 122 F.2d 900, 911. Defendant American Communications Company first leased radio equipment from Federal on March 1, 1950. Letters of plaintiff's counsel on March 29, 1950 and June 29, 1950 gave them notice of plaintiff's contention that these leased sets infringed the Pierce patents. After defendant's counsel denied infringement on July 12, 1950, plaintiff's counsel on July 15, 1950 threatened suit. At that time he also asked for copies of circuit diagrams of the Federal equipment using crystal oscillators, in order to determine with certainty which, if any of them, did infringe. These copies were refused at that time and were not made available until after this action had been commenced. In October, the complaint in this action had been drawn and signed by plaintiff. It was actually filed on June 1, 1951. Thus action was begun fifteen months after the earliest date on which defendant may have infringed. Such delay was not unreasonably long.

 Moreover, there is no showing that defendant made any change of position to its own prejudice in justifiable reliance on a belief induced by plaintiff's conduct that plaintiff did not intend to enforce his right. It is true that in May 1951 defendant did lease from Federal 118 additional receivers and transmitters for use in its business. But this was only ten months after plaintiff's threat of suit. Plaintiff is not alleged to have done anything positive to lead to a belief he was abandoning his position or his rights relative to the alleged infringement, and his delay in filing suit for a few months was certainly not long enough to have justifiably lulled defendant into a belief in such abandonment. Shaffer v. Rector Well Equipment Co., Inc., 5 Cir., 155 F.2d 344, 346.

Defendant's motion for partial summary judgment is denied.

Plaintiff's motions for a preliminary injunction and for partial summary judgment are allowed.