Helen Russell PIERCE, Executrix of the Last Will and Testament of George Washington Pierce, deceased,

v.

AMERICAN COMMUNICATIONS COMPANY, Inc.

Helen Russell PIERCE, Executrix of the Last Will and Testament of George Washington Pierce, deceased

v.

MACKAY RADIO AND TELEGRAPH COMPANY, Inc.

Civ. A. Nos. 51–526, 54–261.

United States District Court
D. Massachusetts.

Dec. 2, 1958.

David Rines, Boston, Mass., for plaintiff.

Robert L. Thompson, Boston, Mass., Edward D. Phinney and John M. Calimafde, New York City, J. Pierre Kolisch, Portland, Or., for defendant.

FRANCIS J. W. FORD, District Judge.

The present proceeding deals with the issues of the validity and infringement of Pierce patents 2,133,643 and 2,266,070, these being the only issues now remaining before this court in this protracted litigation involving a group of six patents issued to Pierce in the general field of the use of piezoelectric crystals in radio broadcasting and reception. See Pierce v. American Communications Co., Inc., D.C., 111 F.Supp. 181, judgment vacated American Communications Co., Inc. v. Pierce, 1 Cir., 208 F.2d 763, certiorari denied 347 U.S. 944, 74 S.Ct. 639, 98 L.Ed. 1092, and Pierce v. American Communications Co., Inc., D.C., 159 F. Supp. 943.

Pierce's basic discovery was the use of a piezoelectric crystal as a means of controlling the frequency of the oscillations of an electric circuit. The two patents involved here deal with various types of boxes or holders for containing such crystals.

Patent 2,133,643

Patent 2,133,643 deals with several different features to be incorporated in holders for crystals, each designed to meet some particular problem involved in the use of these crystals in radio oscillating circuits. Some of these may be found in more than one claim, but the claims relied upon by plaintiff at the time of the trial may conveniently be placed in, five groups, according as they seem to set forth primarily one of these features.[1]

The first group of claims (10 and 74) calls for a holder hermetically sealed by filling any cracks or openings in the container with wax, celluloid varnish or a similar substance. The specification also points out that for better results air or other gas may be evacuated from the container.[2] The object sought is to exclude moisture and dust whose presence might affect the constancy of the frequency of the crystal.

A second group of claims (2–4, 6–9, 19–21, 23–28) is for a mechanical means for mounting the crystal in a circuit. The patent shows only a holder fitted with jacks designed to fit into corresponding plugs in the circuit. Several such holders can be prepared with crystals of different frequencies, which can be readily inserted and removed, thus facilitating changing the frequency of the circuit.

A third group (claims 32, 43–46, 51, 55–70, 72, 76–80, 82–87, 100, 101 and

1. In the brief submitted after trial the claims asserted by plaintiff are reduced in number. Plaintiff now asserts claims 9, 10, 29, 66, 67, 68, 69, 70, 74, 89, 90, 96, 103, 104 and 107 of Patent 2,133,643 and claims 1, 5, 6, 14, 24 and 28 of Patent 2,266,070.

2. The evacuation feature will be discussed later in connection with Patent 2,266,070.

107) is for a holder with an adjustable electrode. In such a holder one of the electrodes forms the base of the holder with the crystal resting freely on this electrode. The second electrode is spaced slightly above the crystal and as shown in the patent is fitted to a screw member by which it can be moved so as to widen or narrow the space between the two electrodes. These two electrodes are connected in the circuit so as to form a capacitor or condenser in series with the crystal. By adjusting the upper electrode the air gap between the electrodes can be varied, thus varying the capacity in the circuit and the frequency of vibration of the crystal. This makes possible a final precise adjustment of the frequency of the circuit.

The two remaining groups of claims deal with means for holding the crystal in place within the holder to prevent the changes in frequency which may result if the crystal moves about. Of course, in order to operate effectively the crystal must remain free to vibrate at its natural frequency. Hence the problem is one of holding the crystal in a fixed position without damping out these natural vibrations.

The fourth group of claims (29 and 53) shows one of Pierce's answers to this problem. These call for a resilient means (as shown in the patent, a metal spring member) which presses against the crystal to prevent it from moving around, yet not so heavily as to interfere with its free vibration.

The fifth group of claims (16, 49, 89–92, 95–98, 102–106, 117, 118) deals with nodal holding of the crystals. The crystals described in the patent vibrate longitudinally, the vibrating motion being greatest at both ends of the crystal with the midpoint or node free of vibrating motion. The patent shows a means of mounting the crystal in a holder between two electrodes which are provided with narrow, raised lands so disposed that the crystal is clamped firmly between them at its nodal point and still remains free to vibrate throughout the rest of its length.

Defendants' first challenge to the validity of these claims is that they lack invention over the prior art. This can best be considered by discussing separately each of the groups of claims previously described.

The essence of the claims in the first group is the use of a hermetically sealed holder to keep out air, dust or moisture which might interfere with the proper operation of the crystal. Even in 1924 there was certainly nothing new in the idea of hermetically sealing a container in order to keep out unwanted foreign substances. We need not go outside the field of piezoelectric crystals for examples. Langevin's British Patent 145,691 for a signaling device utilizing vibrating quartz crystals to send signals under water calls for enclosing his vibrator in a water-tight container. Nicolson's Patent 1,495,429 for a device using piezoelectric crystals calls for sealing the crystals in a compound such as wax. It is true that Langevin's vibrator was designed for a purpose different from that of Pierce and consequently differed from it in structure, having a battery of crystals glued to an electrode rather than single unattached crystals. So also Nicolson may have been primarily concerned with preventing moisture from escaping from the sodium potassium tartrate crystals he used, although he did point out that his crystals would be affected by water either entering or leaving the crystal. But from the point of view of hermetic sealing these containers are basically the same as that of Pierce. Assuming, as plaintiff contends, that Pierce was the first to discover that moisture, dirt or foreign gases could affect the frequency of vibration of the crystals he was using, still it was not invention to utilize the same device, hermetic sealing of the container, which Langevin and Nicolson had already used to keep water or moisture from affecting their piezoelectric crystals.

As to the use of plugs and jacks for connecting components in an electrical system, this was acknowledged by the expert witnesses for both sides to have

been old long before Pierce made his, claimed invention. The plugs used were the same as those which had long been used in making telephone connections. Their use made no change in the operation of the crystal itself but simply made it easier to substitute one crystal for another in a circuit. The Donitz Patent 763,164 and the Varley Patent 772,591 both show the use of plug and jack mountings for induction coils in an electrical system, and for precisely the same purpose as Pierce used them; they make it easier to insert the element into the circuit or remove it therefrom. The use of this plug and jack device to produce the same result in connection with Pierce's crystals and crystal holders clearly does not rise to the level of invention.

The third group of claims is for the use of a variable capacity in the oscillating circuit to change the frequency of oscillation. This use in general was not new with Pierce. There are two prior Cady patents, Re 17,245 and Re 17,355, which show variable condensers connected across or in series with a crystal, and Cady in these patents points out that by varying the capacity of these condensers the frequency of oscillation could be affected. Plaintiff argues that these are not trimming condensers. However, a trimming condenser is merely a smaller and more easily adjusted variable condenser which facilitates small adjustments. In structure and mode of operation it is no different from any other variable condenser connected into the circuit. Dr. Bowles, plaintiff's expert, testified that a trimming condenser was the full equivalent of the adjustable electrode shown by Pierce. In fact the two electrodes between which Pierce places his crystal form a condenser, and when one of these electrodes is movable so that adjustment of it can be made to change the air space between the electrodes and hence the capacity of the condenser, we have simply a variable condenser. Furthermore, the fact that changing the air space separating two electrodes between which a crystal was placed would have an

effect on the frequency of the crystal was specifically pointed out by Cady in a paper published in Proceedings of the Institute of Radio Engineers, April, 1922, pages 107 and 108. Nor can Pierce claim that any invention is found in the particular structure he shows for varying the space between his electrodes, i. e. attaching the upper electrode to a screw which can be turned to raise or lower this electrode, since the Murgas Patent 848,675 shows a wave meter having a variable condenser formed by two electrodes, the upper electrode being attached to a screw which can be turned to raise or lower it, thus varying the distance between the electrodes and thereby the capacity of the condenser.

In the case of the claims directed to a resilient means for holding the crystal in place, the prior disclosure is that of Professor Pierce himself. In his paper in Proceedings of the American Academy of Arts and Sciences, October, 1923, at page 83 he shows a mounting for a quartz crystal of a piezoelectric oscillator. This consists of a hard rubber frame in which the crystal is placed, with sheets of brass screwed to the two faces of the frame above and below the crystal to serve as electrodes. Pierce then states, "A thin sheet of spring brass (marked 'filler') was inserted between one of the electrodes and the quartz, in such a way that only a light pressure was exerted on the quartz." Obviously this piece of spring brass is nothing else than the resilient means called for in the claims for holding the crystal so it does not move but with a pressure light enough so that it does not interfere with the vibrations.

The final group of claims deals with the clamping of the crystal at nodal points. Pierce teaches two specific methods of doing this. In one the opposite faces of the electrodes have narrow projections so placed as to touch the crystal on its two faces at midpoint, where the nodal line for the longitudinal vibration of the crystal is located. In another form a crystal in the shape of a lenticular disc is held between the flat faces of two electrodes which come in

contact with it only at its center which lies on the nodal line. Plaintiff does not seem to rely on these specific mechanical constructions as constituting invention of themselves. Indeed it seems fairly obvious that if the crystal is to be clamped only at nodal points, this can readily be done by giving either the crystal or the electrodes such a shape that the electrodes will touch the crystal only at those points, leaving the rest of its surface free. Nor does plaintiff seem to contend that Pierce was the first to discover that a vibrating crystal had nodal points or where those points were located. What she does claim is that Pierce was the first to teach that by clamping a crystal at these points it could be held firmly without damping its vibrations. There was, however, nothing really new in this. Cady in his paper cited supra points out (page 88) that the piezoelectric crystal should be mounted so as to reduce damping to a minimum and even suggests (page 106) holding it by a thread about its center. But even before Cady or Pierce it was known that vibrating bodies had nodal points and that they could be held at these points without interfering with their vibrations. The ordinary tuning fork is an apt illustration. It has two prongs joined to form a U-shaped structure with a handle at the base of the U where the two prongs meet. The prongs vibrate but there is a node at the point where they join which remains relatively at rest. The fork can be held at this point without affecting the vibration of the prongs, but touching the vibrating prongs themselves damps the vibrations. A similar use of the principle was made by Cady, who at page 109 of his 1922 paper cited supra described how in experimenting with a steel rod as a vibrator, he suspended the rod by means of a small hook screwed into its center so as to leave the rod free to vibrate at its fundamental frequency. Pierce's nodal clamping was merely the application of this familiar knowledge to the vibratory piezoelectric crystal.

■ In summary each of the features here considered involves no invention in itself, but amounts to no more than an adaptation to use in a crystal holder of something already well known in the prior art, an adaptation which lay well within the power of persons skilled in the art. Many of the claims assert more than one of these five features, but plaintiff does not seem to contend that there is any invention in any particular combination of two or more of them. It seems clear that each of these features works in the same way and produces the same result whether used alone or in conjunction with one or more of the others. Nodal clamping, for instance, has the same mode of operation and produces the same results alone as when combined with hermetic sealing or with a jack and plug arrangement. Hence the conclusion must be that nothing in the claims of Patent 2,133,643 constitutes any invention over the prior art.

■ This conclusion as to invalidity is reinforced by the fact that, as disclosed in the file wrapper, this patent was involved in at least eleven interferences with other patents or patent applications. Without going into the merits of the questions involved in these various interferences, the fact that so many inventors in the field came forward at about the same time with similar solutions for the problems involved suggests strongly that these solutions involved not invention but only the skill of persons competent in the art. Kay Patents Corp. v. Martin Supply Co., Inc., 4 Cir., 202 F.2d 47, 50; Himmel Bros. Co. v. Serrick Corporation, 7 Cir., 122 F.2d 740, 746.

■ Another serious defect affects quite generally the claims of this patent. They are for the most part completely functional at the precise point of the claimed novelty. They state the result to be achieved and then claim generally as the invention the result to be achieved. A typical example is claim 10:

"10. A piezo-electric crystal holder comprising in combination a hermetically sealed closure and means within said closure for securing a piezo-electric crystal therein and establishing electrical connection

therewith, while permitting the free vibration of said piezo-electric crystal with substantially no restriction."

Of the other claims now chiefly relied on by plaintiff, 9, 29, 66, 67, 70, 74, 89, 96, 104, and 107 are clearly of this type. As pointed out by this court in Rice v. General Motors Corporation, D.C., 140 F. Supp. 247, 249, such claims, if allowed, would extend the patentee's monopoly beyond what he himself discovered to include all other means by which the same result could be achieved and must be held invalid.

## Patent 2,266,070

Patent 2,266,070 was issued as a result of a division of the original application which matured into Patent 2,133,-643. The features of this patent on which plaintiff relies to establish invention are the use of an evacuated and sealed container for the piezo-electric crystal and the placing of this holder in a constant temperature bath. Evacuation of the container is for the purpose of reducing the effects of air, dirt and moisture on the frequency of the crystal in a more thorough way than does the hermetically sealed holder of Patent 2,133,-643. The sealing of the latter holder keeps out gases, dirt and moisture from the outside but still leaves air, dirt and moisture sealed within the holder which this patent teaches can be removed by evacuation. Evacuation also tends to minimize the formation of corona which also affects frequency and tends to cause crystals, particularly very thin ones, to break. The use of the constant temperature bath is to prevent variations in temperature which might produce small changes in frequency.

The use of evacuated containers as components in electrical systems has long been known. It goes back at least as far as Edison's electric light bulb. And as testified by defendants' expert, Dr. Heising, several years before Pierce's claimed invention, Langmuir and Arnold had worked on pumping more air out of DeForest's vacuum tube to reduce corona discharge and other harmful effects produced by gas. Pierce in providing for evacuated holders for his crystals was merely utilizing a technique well known in the radio art in order to produce the same results it had produced in other connections.

The use of a constant temperature bath was also old. In fact, Pierce makes merely a casual reference to it in his specification, saying only, "The sealed vessel, whether of metal or glass, may be kept in a constant temperature bath, as illustrated in Fig. 2." Specification, page 2, column 2, 11.6–8. This clearly implies that use of devices to maintain constant temperature was already known. To use them to maintain the crystal holder at constant temperature to minimize frequency variations (Cady had already noted that temperature change affected his resonators using quartz crystals, page 108 of his 1922 paper, cited supra) was certainly not invention. Neither is there any force to plaintiff's suggestion that it required any inventive skill to see that a sealed container for a crystal was well adapted for being placed in a constant temperature bath.

The claims now principally relied upon by plaintiff (Claims 1, 5, 6, 14, 24, 28) like those noted above in Patent 2,133,-643, are functional at the precise point of claimed novelty and hence for this reason are invalid.

Judgment will be entered for the defendant in each of these actions, holding the claims of Pierce Patents 2,133,643 and 2,266,070 invalid.