Helen Russell PIERCE, Executrix of the Estate of George Washington Pierce, Deceased, Plaintiff,

v.

ALLEN B. DU MONT LABORATORIES, INC., Defendant.

Civ. A. No. 1624.

United States District Court
D. Delaware.

Sept. 15, 1959.

Thomas Cooch (of Connolly, Cooch & Bove), Wilmington, Del., for plaintiff, David Rines and Robert H. Rines (of Rines & Rines), Boston, Mass., of counsel.

Richard F. Corroon (of Berl, Potter & Anderson), Wilmington, Del., for defendant, Floyd H. Crews and Donald J. Overocker (of Darby & Darby), New York City, of counsel.

LAYTON, District Judge.

This is an action for infringement of five patents issued to Dr. George Washington Pierce, now deceased, his wife having since been substituted as a party. The patents are No. 2,133,642, No. 2,133,-643, No. 2,133,646, No. 2,133,648 and No. 2,266,070. Patent No. 2,133,642, ('642), is the basic patent of the group and may be referred to as the basic Pierce-oscillator patent. Claims numbered 3, 24, 40, 51, 52, 54, 55, 56 and 61 to 68, inclusive, are charged to have been infringed. Also, claims 105 and 106 of the same patent, not concerned with the Pierce oscillator, are charged to have been infringed.

The defenses are (1) invalidity, (2) functionality, (3) vagueness and indefi-

niteness of the claims and (4) violation of the anti-trust acts.

Prior to trial the defendant filed a motion for summary judgment which was denied. The reasons therefor, as well as some history of the background of the patents in suit and of all prior litigation concerning them, is set forth in the opinion of this Court denying that motion.[1] D.C.Del.1958, 166 F.Supp. 332. As will appear therein, most of the claims of all the patents in suit have been litigated in the Federal District and Circuit Courts in Massachusetts and ruled invalid. Reference may be had to the opinions of these Courts as follows:[2] Pierce v. American Communications Co., Inc., D.C.Mass.1953, 111 F.Supp. 181, reversed American Communications Co., Inc., v. Pierce, 1 Cir., 1953, 208 F.2d 763; Pierce v. Hewlett-Packard Company, D.C.Mass.1954, 125 F.Supp. 329, affirmed 1 Cir., 1955, 220 F.2d 531; Pierce v. American Communications Company, D.C.Mass.1958, 159 F.Supp. 943; Pierce v. American Communications Company, D.C.Mass.1958, 169 F.Supp. 351.

### Double Patenting.

The defense of invalidity is based mainly upon two grounds, first, double patenting over Pierce's earlier, expired patent No. 1,789,496 and, second, on the basis of the prior art. The defense of double patenting will be first examined because, in my judgment, it represents the principal defense. It is claimed that patent '642 represents double patenting over patent '496. A brief statement as to

the history of these patents is, thus, appropriate here.

Originally, the application for the Pierce patent (Serial No. 695,094) was filed in 1924. It included general claims for the use of a piezo-electric crystal to control the frequency of an oscillating system. In addition, there were claims for the combination of a radio transmitter and receiver in which piezo-electric crystals might be used. The Patent Office conceived that more than one invention was embodied in the application and allegedly requested[3] a division. Pierce complied and in 1928 filed several applications for division. On one of these applications (Serial No. 247,469), patent No. 1,789,496 was issued in 1931. Serial No. 247,469 was specifically referred to as a division of co-pending application Serial No. 695,094. Returning now to the original application, it was allowed, but for unexplained reasons was forfeited for failure to pay the final fee. It was renewed in 1930 but in 1932 an interference was declared between Pierce and one Miller. A favorable decision to Pierce was not received until June, 1938, and in October, 1938, Pierce patent No. 2,133,642 was finally issued. It resulted, then, that the combination patent '496 was issued years earlier than the basic patent '642.

The system disclosed in '496 comprises a device for transmitting and a device for receiving radio waves. Oscillators are elements of both of these components, an autodyne or self-heterodyne circuit (with a single vacuum tube) forming part of the receiving component. This

---

1. A reading of the briefs indicates that both parties, particularly the plaintiff, have professed to find in this opinion certain conclusions which were intended to have been tentative rather than final.

2. In 1954, the Federal District Court of Florida ruled most of the claims of all the patents in suit invalid on a motion for summary judgment. Pierce v. Aeronautical Comm. Equip. Co. (D.C.Florida 1954). However, that judgment was reversed (but not on the merits) by the

Fifth Circuit Court of Appeals. 255 F. 2d 458.

3. There is sharp dispute as to whether the Patent Office actually ordered a division or whether Pierce's attorney, seeing that he was making absolutely no progress and would not make progress unless he divided his application, voluntarily acquiesced and asked for a division. I have carefully reviewed the evidence on this point and conclude that there was no formal demand, or requirement, for a division.

self-heterodyne circuit "detects" or "demodulates" the low-frequency "intelligence"—music or voice—from the high-frequency radio carrier waves upon which it has been superposed at the transmitting end of the system. The circuit generates local oscillations of a slightly different frequency from those of the transmitter which interact or heterodyne with the latter to produce "beats" of a frequency equal to the difference between them. According to well-known principles, these "beats" permit the transmitted music or voice to be received audibly. This self-heterodyne circuit thus performs both the function of generating local oscillations and detecting the transmitted intelligence.[4]

A self-heterodyne circuit with oscillators other than the one developed by Professor Pierce had been previously successful only at low frequencies because in high frequency transmission and reception the variance in the frequencies at both ends of the system caused the frequency of the "beats" to vary so greatly that the signal could not be steadily received. With Pierce oscillators in the components, the beats were stabilized within a narrow range, thus permitting the constant and steady demodulation of the transmitted music or voice. Thus, with Pierce oscillators in the circuits, radio communication at high frequencies was entirely feasible for the first time.

The combination patent '496 contains three claims. These, as well as a comparison of the second of them with a representative claim of '642 (which claims the oscillator generically) appear in the Appendix. Only this second claim of '496 apparently specifies the Pierce

oscillator as an element in both the transmitter and receiver.[5] The combination as disclosed in claims 1 and 3 may be practiced with other vibrator-controlled, constant-frequency oscillators. As I analyze it, therefore, a generic device disclosed in one patent is a specfied element in one of three claims in a combination patent and an alternative element in the other two claims of that patent.

In the case of Miller v. Eagle Manufacturing Co., 1894, 151 U.S. 186, 198, 14 S.Ct. 310, 315, 38 L.Ed. 121, the Court expressed the broad criteria for determining whether two patents may be issued on related devices:

"* * * no patent can issue for an invention actually covered by a former patent * * * the second patent, although containing a broader claim, more generical in its character than the specific claims, contained in the prior patent, is also void; but that where the second patent covers matter described in the prior patent, *essentially distinct and separable* from the invention covered thereby and claims made thereunder, its validity may be sustained. (Emphasis added.)

"In the last class of cases it must distinctly appear that the invention covered by the later patent was a *separate invention, distinctly different and independent* from that covered by the first patent * * * it must be something *substantially different* from that comprehended in the first patent." (Emphasis added.) [6]

■ A basic principle of law relating particularly to patents on combinations-and-elements was enunciated in Palmer

4. This operation is different from that of strictly "super-heterodyne" demodulation in which the two processes of oscillation and detection occur in two separate circuits.

5. Although the Pierce oscillator is not named as such, plaintiff agrees that it is the oscillator which is specified twice in that claim. See p. 3 of her Brief

After Final Hearing, p. 88a of her Appendix thereto:
"* * * claim 2 of this combination patent 1,789,496 recites two Pierce oscillators * * *."

6. This applies whether the relationship between the two devices is that of basic invention and improvement, as in Thomson-Houston Electric Co. v. Ohio Brass

Pneumatic Tire Co. v. Lozier, 6 Cir., 1898, 90 F. 732, at page 744:

> "One cannot extract an essential element of his invention from a former patent, without which the former patent would not have been granted, and make it the subject of a subsequent patent * * *."
>
> "* * * if the second patent is for a *distinct* and *separate* invention, or to put the matter another way, has not been *made integral* with another invention already patented, so as to be fairly necessary to its use, it should be sustained. * * *" (Emphasis added.)

In that case an inventor was denied a patent on a certain fabric generically because of a prior patent on a tire constructed basically of that fabric, the court stating, at page 739:

> "It is manifest * * * that the essential feature of the invention was the devising of the new fabric * * * and making it a constituent part of his 'bicycle and other tubing.' Indeed, the tubing would not have been patentable at all without it, for it would have been nothing more * * * than had already been patented."

This fundamental principle was relied upon in the 1951 decision of the Court of Customs and Patent Appeals, Application of Coleman, 189 F.2d 976, 979, 28 CCPA 1156:

> "If the claims are so related that the separately claimed element constitutes the *essential distinguishing feature* of the combination as claimed, different concepts are not involved, the inventions are not distinct, and double patenting will be found. Palmer Pneumatic Tire Co. v. Lozier [supra]; In re Hawkins, 57 F.2d 367, 19 C.C.P.A., Patents 1104." (Emphasis added.)

The Coleman case, 189 F.2d at page 979, recognized that:

> "It is settled law that a party might be entitled to a patent for a combination *because of the cooperation of the elements contained therein,* and at the same time be entitled to a separate patent for one of the elements of the combination. In re Carlton, 77 F.2d 363, 22 C.C.P.A., Patents, 1223; In re Ferenci, 83 F. 2d 279, 23 C.C.P.A., Patents, 1023.
>
> "In such a case, the question to be determined is *whether two or more different inventive concepts are involved.* In re Hadsel, 173 F.2d 1010, 36 C.C.P.A., Patents, 1075." (Emphasis added.)

The Coleman case involved two patents which bear much the same relationship as those issued to Pierce. One was for a method, or process, of protecting foodstuffs, consisting basically of two elements: (1) a chemical injected into the food, and (2) a wrapper. The other patent covered a particular wrapper, a "fungistatic wrapper", which might or might not be used as an element in the combination. The issue of double patenting was raised, and the court struck it down holding that two different patentable items were involved, because two different inventive concepts were embodied therein.

[redacted] In the case at bar, then, the basic question is one of general patentability—whether the combination and element each possess novelty and utility apart from their conjoint use. If the operation of the combination system is unique because of the interaction of its elements,

Co., 6 Cir., 1897, 80 F. 712, or a narrow and broad form of the same invention, as in Union Typewriter Co. v. L. C. Smith & Bros., C.C.W.D.Pa.1909, 173 F. 288, or a combination and element as in the case at bar and the cases of In re Carlton, 1935, 77 F.2d 363, 32 CCPA 1223, Application of Coleman, 1951, 189 F.2d 976, 38 CCPA 1156, or Palmer Pneumatic Tire Co. v. Lozier, 6 Cir., 1898, 90 F. 732, or merely two operations of the same invention as in the Miller case itself.

apart from the presence of the Pierce oscillator, two different inventive concepts are involved.

However, I have not been convinced that the two are separate and distinct inventions. A necessary presupposition to my finding that the Pierce oscillator constituted an important and patentable advance in the art of radio communication by making possible for the first time high-frequency transmission and reception is that, at that time, no other oscillator existed which made this possible. I note that again and again in her brief and appendix thereto, plaintiff seems to emphasize that the patentability of the system in '496 depends on its constituting a solution to the problem of dependable high-frequency communication.[7] This proposition of the plaintiff in conjunction with my finding that at the time there was no other oscillator which, in the combination, would produce the new result, leads inescapably to the conclusion that, in so far as claims 1 and 3 of '496 permit other oscillators to be elements of the system, neither made a patentable contribution to the art. Such systems were only useful at low frequencies. However, these claims, in so far as they embrace the use of the Pierce oscillator, and claim 2 which specifically recites this oscillator, do disclose a patentable contribution.

The Pierce oscillator, then, is the essential distinguishing feature of '496. This seems clear from plaintiff's own statement of the problems solved by the two inventions:

"The problem solved by the invention of the Pierce oscillator was to obtain vacuum-tube oscillations of constant frequency. The problem solved by the invention of the combination radio transmitting-and-receiving system, on the other hand, was to make it possible to use high frequencies in radio transmission and reception."

This use of high frequencies was made possible by the constant frequencies produced by the Pierce oscillator.

Plaintiff contends, however, that any one of four other features in the combination system renders it patentable independently of this oscillator. The first is the use of an autodyne or self-heterodyne circuit in the receiver. However, this was not new. As Prof. Bowles testified at trial, a "single tube used as the oscillator and the mixer" is shown in the prior Armstrong Patent No. 1,342,885, issued June 8, 1920. Further, as stated by the Patent Examiner in his letter of July 21, 1927:

"Heterodyne receivers are old and well-known in the art, of which the Wold and Englund patents are merely illustrative forms * * *."

"The same argument applies to the 'autodyne' type of receiver in which the oscillator is also a rectifier. Franklin and Langmuir are illustrative patents which show this idea to be old * * *."

Secondly, plaintiff argues that patentability exists because two oscillators are necessary for operation of the system, one each in the transmitter and receiver. However, in my judgment, merely because two are required of the single oscillator described in '642 does not render the claim patentably different.

Next, plaintiff argues that a novel attribute of the combination patent is that the transmitter and receiver must "work together". But, this is due solely to the presence of a constant-frequency oscillator in both the transmitter and receiver. The two components "work together" because each produces waves of constant frequency, thus making possible the use of the self-heterodyne method of detection. At high frequencies, the Pierce oscillator is the only one which would at that time make the use of the method successful and for its successful use at these high frequencies the two compo-

---

7. See p. 22 of her Brief, and pp. 5a–8a, 12a, 18a, 23a, 24a, 29a and 37a, of the Appendix thereto.

nents of the system must "work together". Therefore, at high frequencies, the uniqueness of the transmitter and receiver necessarily working together depends on the Pierce oscillator.

Finally, plaintiff asserts that patentability exists independently of the oscillator in the fact that a stable oscillator is used in the self-heterodyne circuit.[8] Previously in the art it had always been thought that for the self-heterodyne method to be effective, the oscillator used should be as unstable as possible. Pierce discovered, however, that this was not so—that a stable oscillator would function as well. But, even assuming that this is a patentable discovery, and that it is included in the claims of the patent because inherent in the combinations disclosed, there is no causal connection between this property of stability and the success of the apparatus at high frequencies. This is for the reason that even if the quality of stability were present, if the high-frequency carrier waves transmitted and those received were not of constant frequency, communication would still be erratic. There would be an unsteady "beat" which would render impossible uninterrupted demodulation in the self-heterodyne circuit. At low frequencies, no substantially different result would be obtained than with prior combination systems.[9]

Since, therefore, the Pierce oscillator is the essential distinguishing feature of the combination patent, there being no distinct and separate inventive concept therein apart from the use of that oscillator, no valid separate patent could subsequently issue on the oscillator alone.

The language in Gold v. Gold, 2 Cir., 1911, 187 F. 273, 274, is peculiarly applicable here:

"* * * the so-called generic invention for which the complainant asks a patent is disclosed in patent No. 771,628 * * * and * * * if another patent be given the complainant containing the broad claims asked for * * * [w]e see no answer to the proposition that the proposed patent would be void for double patenting. If the facts alleged in the bill be correct, the claims of the new patent, if issued, will cover the specific devices covered by the claims of No. 771,628, which devices the public have a right to use immediately after the expiration of that patent."

Accordingly, I hold that claims 3, 24, 40, 51, 52, 54, 55, 56 and 61–68 of patent No. 2,133,642 are invalid for double patenting over patent No. 1,789,496. American Communications Co. v. Pierce, 1 Cir., 1953, 208 F.2d 763; Pierce v. Hewlitt-Packard Co., 1 Cir., 1955, 220 F.2d 531.

A necessary corollary of my holding is that any requirement by the Patent Office that Pierce divide his original application was erroneous. While it is true that a decision of the Patent Office "should not be lightly overruled", In re Cady, 1935, 77 F.2d 106, 109, 22 CCPA 1190, and that an applicant cannot be penalized for compliance with a requirement for division in the Patent Office, National Tube Co. v. Steel & Tubes, 3 Cir., 1937; 90 F.2d 52, the instant case is perhaps distinguishable because it is reasonably clear that no official action was entered by the Patent Office requiring a division; and in the view I take of the case Pierce was not penalized in any event, for he received the full seventeen years' protection to which he was entitled.[10] Moreover, even were this not the case, a decision of the Patent Office is not absolutely binding on this Court. American Communications Co. v. Pierce, supra.

8. The "stability" referred to here is the quality of sustained operation, not the constancy of the frequency of the oscillations produced.

9. The result might be somewhat better but this is a matter of degree only.

10. It might be added in this connection that the Steel & Tubes case has only a nar-

Another corollary proposition to my holding is that patent '496 protected Pierce on his oscillator generically. This is at variance with the opinion of the Fifth Circuit Court of Appeals in Pierce v. Aeronautical Communications Equipment Co., 1958, 255 F.2d 458, at page 463, where the Court said:

"If someone had used the Pierce oscillator in a system other than the radio system described in No. 1,789,496, the plaintiff would have had difficulties, perhaps insurmountable, in proving that he was afforded protection under No. 1,789,496. A patent on a combination is a patent on the functioning whole, not on the separate parts and the fact that an unpatented element of a combination may distinguish the invention does not draw to it the privileges of a patent. Mercoid Corporation v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376; Mercoid Corporation v. Minneapolis-Honeywell Regulator Co., 320 U.S. 680, 64 S.Ct. 278, 88 L.Ed. 396; Rowell v. Lindsay, 113 U.S. 97, 5 S.Ct. 507, 28 L.Ed. 906. * * *"

However, with deference to the view of the Fifth Circuit Court, I do not believe that the Mercoid cases, nor Rowell v. Lindsay, nor the authority relied on in those opinions, forecloses protection in this case. What these cases mean, it seems to me, is that when a patent is issued for a device embodying a particular inventive concept, the protection of that patent does not extend to another inventive concept consisting in the combined operation of the elements; but the protection does extend to *the* inventive concept in the combination. When this consists in one of the elements therein, that element is protected.

In my judgment, then, the rule of these cases is not controlling. Its invocation in this situation does not comport with the basic policy of the patent laws nor with the sound rule of law that one cannot extract the essential distinguishing feature from a patented combination and secure a separate patent on it.

### Claims 105 and 106.

There remain for disposition Claims 105 and 106 of patent No. 2,133,-642. These two claims fall into a different category. They are method claims and call for but a single step, i. e., changing the temperature of a piezo-electric crystal. The prior art disclosed that when one desired to control the frequency of a vibratory device it was important to disclose the temperature as one of the important factors. In my opinion, the following publications clearly anticipated these two claims: The Herbert article (Def. Ex. 4), the Dadourian article (Def. Ex. 4) and the Valasek article (Def. Ex. 4). The claims are invalid over the prior art. The defendant has argued very convincingly that these same two claims are invalid for failure of any disclosure to support them. In view of my conclusion as to their invalidity over the prior art, it is unnecessary to decide this point.

### Remaining Patents.

Patents No. 2,133,643, No. 2,133,646, No. 2,133,648 and No. 2,266,070 must now be examined and disposed of. The discussion will be brief because I am in agreement with Judge Ford's disposition of the same patents in Pierce v. American Communications Company, D.C., 159 F.Supp. 943 and Pierce v. American Communications Company, D.C., 169 F. Supp. 351.

The first patent for consideration is No. 2,133,643 ('643). The claims in suit are 9, 10, 29, 66, 68, 70 and 71. Claim 9 covers a plug-in crystal holder. Claim 10 covers a hermetically sealed

row application, probably not applicable here in any event. Compare the implied criticism of this decision in Biesterfield, Patent Law, p. 85, where the author says:

"This [the result in Steel & Tubes] may be true in certain cases where there is an apparent difference in the inventions but it is not believed that it could excuse any true cases of double patenting."

crystal holder. Claim 29 covers a crystal holder having means for resiliently maintaining the electrode in contact with the crystal. Claims 66 and 68 claim a method of adjusting the frequency of a crystal by varying the spacing between the electrode of a crystal holder and the face of the crystal. Claim 70 covers a variable capacitor for adjusting the frequency of the oscillations of a crystal. Claim 71 claims a method of varying the frequency of a crystal by varying a capacity.

A discussion of these claims will be clearer if they are examined in the following order. Claim 10 provides for a hermetically sealed holder. The idea of a hermetically sealed holder is not new and was not new in Pierce's time. Such a holder for a piezo-electric crystal is revealed in the Nicholson patent No. 1,-495,429. Claim 10 of the patent is accordingly invalid because of anticipation by the prior art. Pierce v. American Communications Company, D.C.Mass. 1958, 169 F.Supp. 351.

Claim 9 is likewise invalid over the prior art. It covers a plug-in crystal holder. Such devices have been employed for many years in various ways—for instance, telephone jacks. See the Donitz patent No. 763,164 which covers plug-in coils for a wave meter. Pierce v. American Communications Company, D.C., 169 F.Supp. 351.

Claims 66, 68 and 70 and also Claim 71 fall into a natural group. They call for the employment of a variable capacity in the oscillating circuit to change the frequency of the oscillations.[11] This use was not new with Pierce. Two prior patents demonstrate that by varying the capacity of variable condensers connected in series with a crystal, the frequency of oscillations will be varied. See Cady patents Reissue No. 17,245 and No. 17,-355. Claims 66, 68, 70 and 71 are, therefore, invalid because of the prior art. Pierce v. American Communications Company, D.C., 169 F.Supp. 351.

Claim 29 is directed to a resilient means for holding the crystal in place. Pierce, himself, in a paper in the "Proceedings of the American Academy of Arts and Sciences", Oct. 1923, reveals a mounting for a crystal of a piezo-electric oscillator. This claim is invalid over this prior art publication. Pierce v. American Communications Company, D.C., 169 F.Supp. 351.

It follows, then, that patent '643 is lacking in patentable invention.

■ Patent '646 is directed to harmonic generating or selecting circuits. The emphasis in the claims is the inclusion of the Pierce oscillator as an element in a harmonic selector or harmonic amplifier circuit. Oscillators had been used previously in such circuits. The patent discloses that harmonic selector circuits were not new. The actual claim of the patent was the substitution of the Pierce oscillator for the former generators as the source of oscillations. There is double patenting over '496. See Pierce v. American Communications Company, D.C., 159 F.Supp. 943.

The defendant argues very convincingly also that the claims of '646 are invalid over the prior art. In the light of what has been decided, it is unnecessary to consider this contention.

■ Patent '648 concerns an oscillator and an impedance in circuit. The purpose is to vary the frequency of the oscillator. The use of an impedance in circuit with an oscillator for varying the frequency of an oscillator was not then a new thing. The distinguishing element in the '648 patent not revealed in the prior art is the type of oscillator employed. This oscillator was the Pierce oscillator in '496. Patent '648 is invalid for double patenting over '496. Pierce v. American Communications Company, D.C., 159 F.Supp. 943.

■ Patent '070 is directed to evacuated crystal holders in order to prevent

---

11. Claim 71 is a method claim which shows the step of varying a capacity in order to vary the crystal frequency.

corona discharge while the crystal oscillates. Claim 1 covers a crystal holder which has been evacuated and held at a constant temperature. Claims 6 and 14 call for means surrounding the crystal to prevent a corona discharge. Claims 8 and 16 provide for an evacuated crystal holder. The method of preventing corona discharge, according to the patent, is a vacuum. But the use of an evacuated container in electrical systems preceded Pierce. Both Langmuir and Arnold had conducted experiments in pumping more air out of De Forest's vacuum tube in order to reduce corona discharge. Nor is there invention in suggesting that a sealed container for a crystal was adapted for being placed in a constant temperature bath.

Patent '070 is both invalid over the prior art and lacking in invention. Pierce v. American Communications Company, D.C., 169 F.Supp. 351.

 Finally, there is the defendant's motion for attorneys' fees in preparing for the defense of the '645 patent which, without previous notice, was taken out of suit at the opening day of trial. Generally speaking, I can see nothing wrong with the principle of penalizing a plaintiff for causing a defendant unnecessary time and expense in preparing for trial on an issue or issues which, without warning, are dropped. Aeration Processes, Inc., v. Walter Kidde and Co., Inc., 2 Cir., 170 F.2d 437; Id., 2 Cir., 177 F.2d 772. The extent of such an award to the defendant will be gone into more thoroughly, if, upon final judgment, the matter is still appropriate.

In the light of the conclusions here reached, it becomes unnecessary to consider and decide the additional defenses of functionality, vagueness and indefiniteness of the claims and violation of the anti-trust acts.

What has been said heretofore shall be deemed to constitute findings of fact and conclusions of law.

Order upon notice.

## Appendix

### Claim 1 of patent No. 1,789,496

A transmitting and receiving system having, in combination, means for transmitting signal waves, means for receiving the signal waves, a local oscillating system comprising an amplifying relay having an inherent regenerative coupling, a source of energy, a piezo-electric body, and means connecting the relay, the source and the body together, the connecting means being such that the local system can not oscillate through the inherent regenerative coupling when the body is disconnected from the system, whereby the frequency of the waves of the local oscillating system is maintained substantially constant, and means for combining the received waves with the local waves.

### Claim 3 of patent No. 1,789,496

A transmitting-and-receiving system having, in combination, a transmitting system for transmitting electric waves, an electromechanical vibrator connected with the system for maintaining the frequency of the transmitting system substantially constant, the connections being such as to prevent the operation of the transmitting system at other than the said substantially constant frequency, a receiving system for receiving the electric waves, the receiving system being traversed by local oscillations, and an electromechanical vibrator connected with the receiving system for maintaining the frequency of the local oscillations substantially constant, the connections of the second-named electromechanical vibrator with the receiving system being such as to prevent the local oscillations at other than the second-named substantially constant frequency.

| Claim 2 of patent No. 1,789,496 | Claim 67 of patent No. 2,133,642 |
|---|---|
| A transmitting and receiving system having, in combination, means for transmitting signal waves, means for receiving the signal waves, each of said means comprising a source of electric energy, | A generating system |
| | of constant frequency oscillations |
| a tube having a plurality of electrodes, | comprising a vacuum tube, |
| an electro-mechanical vibrator | a piezo-electrical element of hard, durable material |
| having two electric terminals respectively connected with two of the electrodes, | provided with a single pair of operative electrodes in circuit with said tube, |
| means substantially non-periodically connecting the source, the tube and the vibrator together | |
| | and a resonant circuit in the output of said tube carrying oscillating currents |
| to maintain the vibrator in vibration and the system in oscillation with a frequency widely independent of the electrical constants of the system and determined by a mode of mechanical vibration of the vibrator, | having a frequency determined at all times by a natural period of mechanical vibration of said piezo-electric element, |
| the electrical parameters of the system being such that the system will not oscillate in the absence of the vibrator, | said piezo-electric element constituting an essential element in the system for the generation of oscillations. |
| the terminals being adapted to act conjointly both for electric stimulation and electric response to effect the oscillation of the system, and means for evidencing beats. | |