**Helen Russell PIERCE, Executrix, Plaintiff, Appellant,**

v.

**AMERICAN COMMUNICATIONS COMPANY, Inc., et al., Defendants, Appellees.**

**No. 5529.**

United States Court of Appeals First Circuit.

Heard Nov. 2, 1959.

Decided June 30, 1960.

Robert H. Rines, Boston, Mass., with whom David Rines and Rines & Rines, Boston, Mass., were on brief, for appellant.

J. Pierre Kolisch, Portland, Or., with whom Robert L. Thompson, Boston, Mass., Edward D. Phinney, Albert Reiss, New York City, and Dike, Thompson &

Bronstein, Boston, Mass., were on brief, for appellees.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

WOODBURY, Chief Judge.

This is another chapter in protracted litigation in this and other circuits involving a group of patents for electrical systems and apparatus for use primarily in the art of radio communication issued to the late George Washington Pierce.[1] This time we have before us four appeals by the plaintiff below. One pair of appeals is from a single final judgment entered in two cases consolidated in the District Court for the purpose of hearing and trial which, with costs to the defendants, (1) granted their motions for summary judgment and denied like motions in each case by the plaintiff with respect to four patents, Nos. 2,133,642, 2,133,645, 2,133,646 and 2,133,648, and (2) dismissed the plaintiff's complaints and granted the defendants' counterclaims for declarations of invalidity as to all claims of the above patents and also two others, Nos. 2,133,643 and 2,266,070. The other pair of appeals is from the denial of a motion by the plaintiff under Rule 59(e) F.R.Civ.P., 28 U.S.C.A., to alter or amend the above judgment and from the denial of her motion to correct docket entries. All four appeals were consolidated and docketed as a single case in this Court.

This chapter in the litigation over the Pierce patents opened in 1951 with a complaint by the patentee against American Communications Company, Inc., American or American Communications hereinafter, charging it with infringing the six patents already mentioned and still another one, No. 2,133,-644.[2] In that suit both parties moved under Rule 56 F.R.Civ.P. for partial summary judgment as to thirteen claims (claims 51, 52, 54, 55, 56 and 61 to 68

inclusive), of the basic patent of the group, No. 2,133,642. Holding the above claims valid and infringed, the District Court granted the plaintiff's motion and denied the defendant's. On appeal, however, this court reversed. American Communications Co., Inc. v. Pierce, 1 Cir., 1953, 208 F.2d 763. In our view the thirteen claims involved were invalid, wherefore we remanded for entry of a judgment for the defendant.

In April, 1954, soon after our decision in the American case, the patentee filed a complaint in the court below charging Mackay Radio and Telegraph Company, Inc., Mackay hereinafter, with infringing the six patents enumerated above. The two cases proceeded on their separate ways in the District Court until September, 1958, when that court granted the defendants' motions for a joint trial. Prior to that time, however, in January, 1958, the court below had granted motions by both defendants for summary judgment insofar as four of the six patents in suit were concerned but had denied the motions with respect to the other two which we shall refer to hereinafter as the '643 and '070 patents. After an extended trial without a jury the court below concluded that all claims of the two latter patents were invalid. Wherefore it entered the final judgment with respect to all six patents, and soon thereafter the orders denying the plaintiff's motions from which the plaintiff below has taken these appeals.

We first turn our attention to the four patents as to which the District Court granted the defendants' motions for summary judgment.

The District Court held that all of the claims of all of these patents were invalid for double patenting for the reason that in substance and essence they claimed the same invention disclosed and covered in the claims of a prior patent, No. 1,789,496, issued to Pierce on Janu-

---

1. Dr. Pierce died during the pendency of the present actions which were prosecuted thereafter by the present appellant, his widow and executrix.

2. Somewhere along the line this patent seems to have dropped out of the case.

ary 20, 1931, which, of course, expired seventeen years later on January 20, 1948. This earlier patent issued on an application filed on January 18, 1928, as a division by Patent Office order of an application filed on February 25, 1924, which in the Commissioner's belief described more than one invention. It covered in its three claims radio transmitting and receiving systems each with a two electrode electromechanical vibrator, preferably in the form of a piezo-electric crystal in a single vacuum tube circuit the utility of which was to obtain constant frequency of the oscillations of each system to a far greater extent than had previously been possible. To gain some idea of what we understand this to mean it will first be necessary to describe briefly and in general what is known in the art as the heterodyne receiving system which was not new with Pierce.

A radio antenna picks up radio waves sent out by the sending or transmitting station. That is to say, it operates as a conductor in a magnetic field (radio waves are electromagnetic), and as it intersects or cuts through the field an electric current is induced in the antenna of the same frequency as that sent out by the transmitting station. The electric current induced in the antenna first passes through the radio frequency amplifier in the receiving set where its power is increased but its frequency is not changed. From the amplifier the current next goes to the first detector, known as the mixer or converter, where the heterodyning action takes place.

This action can best be described by illustration. Let us suppose that the electric current picked up by the antenna and entering the first detector from the frequency amplifier has cyclical variations of 50,000,000 per second, i. e., 50 megacycles. For reasons we need not explain this frequency is far too high; in some way it must be reduced. This is the function of the local oscillator in the receiving set which furnishes a fre-

quency slightly different from that of the sending station to produce a "beat." This "beat" produced by the difference between the frequency of the oscillations of the receiver and the frequency of the oscillations of the transmitter, as we pointed out in another chapter in the litigation over the Pierce patents,[3] is comparable to the beat produced when two tuning forks of slightly different frequency are caused to vibrate at the same time. Now let us assume that the local oscillator in the receiving set furnishes a frequency of 50,001,000 cycles, although it would make no difference if it furnished a frequency sightly lower than that of the sending station. The important thing is variation between frequencies of the sending and receiving stations. In our illustration this variation is 1,000 cycles, a frequency better adapted for ultimate conversion to sound in the receiving set.

The radio process from this point on to the production of audible sounds is not too important for present purposes, and we need not attempt to describe it.

Dr. Pierce was not the inventor of this heterodyning action, nor was he the first person to use a piezo-electric crystal in an oscillator. Prior to Pierce a Dr. Cady had patented an oscillator in which the crystal controlled oscillations produced elsewhere in the circuit but did not itself produce oscillations. Pierce's contribution to the art was to show an oscillator wherein the crystal not only controlled the frequency, as in Cady, but itself actually produced the frequency or oscillations. In Cady the circuit could oscillate independently of the crystal since the crystal did not produce but merely controlled oscillations produced elsewhere in the circuit. The advantage of Pierce's system over Cady's is that a change of constants in the circuit, which might result from a battery running down, will not affect the oscillations produced by the oscillator since the crystal itself produces the oscillations.

3. Pierce v. Hewlett-Packard Co., 1 Cir., 1955, 220 F.2d 531, 532, certiorari denied 1955, 350 U.S. 833, 76 S.Ct. 69, 100 L.Ed. 744.

The practical value of Dr. Pierce's invention was to permit the use of very high frequencies in radio communication. This he accomplished by keeping the oscillations of both the sending and the receiving stations at practically constant frequency by means of his vibrators or oscillators in the preferred form of piezoelectric crystals in a single vacuum tube circuit. Obviously close control of the oscillations at one station without similar close control at the other would not be of much value in radio communication. In the specification of his expired 1,789,496 patent he says that his " * * * invention is particularly useful where constant-frequency sources are used at the transmitting station and also at the receiving station." He illustrates the value of his invention in the specification of his expired patent as follows:

"Both in telegraphy and in telephony, the oscillations of the system will be kept at practically constant frequency by the vibrators, making it possible, for example, to use a very high frequency, with all the advantages flowing therefrom. For example, consider a frequency of 50,-000,000 cycles, corresponding to 6-meter wave length. A control of the frequency to within one tenth of one percent would obviously involve a difference in variation of 50,000 cycles. With a variation in frequency as great as 50,000 cycles, the signal is continually running off the setting of the receiving system, with the result that the operator has to shift continuously, trying to catch it here and catch it there. A part of the signal is detected, but a large part is often lost. According to the present invention, on the other hand, it is possible to maintain the frequency to within 1/100,000 of one percent. This involves a variation of only five cycles on a frequency of 50,000,000. Indeed, by proper care, it is possible to keep the variation within only one cycle.

"The importance of this beat reception will be realized when it is reflected that the local oscillator used for voice modulation may have a frequency of 1,000 cycles. A variation of 50,000 cycles or for that matter, a variation of only 500 cycles, is a serious problem for beat reception under such circumstances. A variation of only five cycles, on the other hand, or, for that matter, as much as 50 cycles, could readily be handled."

We turn now to consideration of the four Pierce patents as to which the court below granted the defendants' motions for summary judgment.

■ In the American Communications case and again in the Hewlett-Packard case, both cited hereinabove, this court held that thirteen claims of patent No. 2,133,642 made no new contribution to the progress of science and the useful arts. In our view those thirteen claims did not cover an invention essentially distinct and separate from the invention covered in claim 2 of Pierce's expired patent No. 1,789,496. It is true that this expired patent covered specifically transmitting and receiving systems having the Pierce piezo-electric crystal vibrator "in combination." Nevertheless in the Hewlett-Packard case at pages 532 and 533 of 220 F.2d we said: "The plaintiff received patent No. 1,789,496 only because of his contribution of a device which stabilized the frequency of oscillations of an electric circuit. Without this device the patent would not have been granted. The plaintiff cannot extract this essential element and make it the subject of a subsequent patent." That is to say, we considered the nub and heart of Pierce's expired patent to be his oscillator, meaning by that, his piezo-electric crystal in a single vacuum tube circuit, and that no separate inventive concept was involved in using two of his oscillators in combination, one in a transmitting and the other in a receiving system. Moreover, in both of the above cases we held that on the issue of double patenting it was of no consequence that the later issued patent was the basic one and that the earlier patent issued on a divisional application perhaps

erroneously required by the Patent Office. At page 769 of 208 F.2d we said:

"With respect to combined transmitting and receiving systems utilizing the Pierce oscillator, * * * the plaintiff has suffered no hardship because of the delayed issuance of his basic patent No. 2,133,642. The plaintiff by means of patent No. 1,789,496 has already received the full seventeen years protection granted him by law on such systems. We cannot now extend that monopoly under the mantle of patent No. 2,133,642."

The District Court clearly and, of course quite correctly, recognized that in the American Communications case it was bound by our previous opinion in that case to hold the thirteen claims of the 2,133,642 patent which we had then passed upon invalid.[4] That court, of course, also recognized quite correctly that it was not similarly bound in the Mackay Radio and Telegraph case, Pierce v. Mackay Radio and Telegraph Co., D.C., 169 F.Supp. 351. But, concluding that there was nothing in the affidavits etc. before it in these cases substantially different from the material before this court on the two previous instances when we passed on the validity of these thirteen claims, it held in the light of the law as laid down in our decision that those claims were also invalid as against Mackay. Then, finding that the thirteen claims of the 2,133,642 patent already held invalid were typical of all the claims of the patent—that none of the remaining claims of the patent covered anything substantially different from the thirteen invalid claims—it granted the defend-

ants' motions for summary judgment as to that patent *in toto*. It said:

"It is clear that all of the claims of patent No. 2,133,642 are for the same invention. They vary in defining the Pierce piezo-electric oscillator in broad terms or in closely limited language, or in similarly describing other elements of the system closely or broadly, or in claiming the use of the Pierce oscillator generally in an electrical system or in a specific circuit of that system. But what is described in all of them is substantially the same—the use of a piezo-electric crystal in a single vacuum tube system for the purpose of stabilizing the oscillations of the system. Hence what was said by the Court of Appeals as to certain of these claims applies equally to all of them."

We agree with the District Court.

No useful purpose would be served by our undertaking to analyse separately each of the remaining ninety odd claims of the 2,133,642 patent. It will have to suffice for us to say that studying these claims in the light of the specification it seems to our lay minds that all they describe in substance and effect in their varying language is the use of the basic Pierce oscillator disclosed in patent No. 1,789,496 in a variety of circuits for essentially the same purpose.

A little more must be said, however, with respect to the last two claims of the No. 2,133,642 patent, claims 105 and 106. Claim 105 does not describe the Pierce oscillator but claim 106 obviously does. Essentially, however, both claims undertake to cover changing the temperature

---

4. In our opinion in the Hewlett-Packard case at page 532 of 220 F.2d we said: "It is enough to say that we found in the American Communications Co. case that the plaintiff in patents Nos. 1,789,-496 and 2,133,642 made only one distinctive contribution to the 'Progress of Science and Useful Arts,' U.S.Const. Art. I, § 8, and that was the invention of a two electrode piezo-electric crystal in a single vacuum tube circuit." The hope may be vain but perhaps now counsel for the plaintiff will give over the attempt to convince this court that all we held in the American Communications case was that the thirteen claims of the 2,133,642 patent then before us were merely unenforceable so that it is still open to the patentee to prove the validity of those claims vis-a-vis not only Mackay but also American.

of a piezo-electric crystal to vary its oscillations. In essence they read substantially the same to cover "A method of controlling the frequency of vibration ["operation" in claim 106] of a piezo-electric crystal that comprises changing the temperature of the crystal from normal room temperature to a temperature to cause oscillation at a desired substantially precise frequency of vibration."

There is little if any disclosure in the patent to support these claims. All that is said in the specification with respect to temperature is that in the preferred form of the invention described therein " * * the disturbing effects,—such as those produced by changes of temperature, * * *—on the frequency of oscillations usually amount to less than one one-hundredth of one percent of the frequency." But whether the claims have any adequate disclosure in the specification to support them or not, it is evident that there is no description in them or anywhere in the patent of any device or means for varying the temperature of the crystal from room temperature. If valid, they would cover any and all means for changing the temperature of the crystal from room temperature to make the frequency of its vibrations to some undisclosed extent independent of room temperature. If these claims are anything more than an attempt to monopolize an already observed phenomenon of piezo-electric crystals, at the most they cover only a result obtained by varying the temperature of the crystal from room temperature. They are vague at the precise point of any possible novelty.

The next patent in this group, No. 2,133,645, in its 24 claims covers the Pierce piezo-electric crystal oscillator either standing alone or in the receiving set of the transmitter-receiver combination claimed in expired patent No. 1,-789,496. The claims vary in their language. Some are broad covering the oscillator generally; some are narrow covering the oscillator in specific combinations with old elements of receiving sets. All of them, however, claim no more than the same oscillator claimed in Pierce's expired patent No. 1,789,496 and again in his patent No. 2,133,642. Obviously the claims are invalid for double patenting.

Much the same may be said of the two remaining patents in this group. Patent No. 2,133,646 covers the Pierce oscillator coupled to a harmonic selector or frequency multiplier circuit. In order to produce frequencies of over 3,000,000 cycles Dr. Pierce found it necessary to use a harmonic frequency of his piezo-electric crystal for the reason that to construct a crystal capable of producing a frequency of over 3,000,000 cycles it was necessary to cut or grind the crystal so thin (to less than a millimeter) that it was too weak for handling and use. Since a usefully strong crystal of itself produced only oscillations of relatively low frequency, it is essential to couple the oscillator with a harmonic selector circuit in order to produce oscillations of high frequency which are harmonics or multiples of the frequency produced by the crystal itself.

It is clear from reading the patent that frequency multiplication by harmonic selector circuits was not new in the radio art at the time this patent was issued. Nor was there any novelty in coupling an oscillator with a harmonic selector. All that was new in this patent was the introduction of a source of constant frequency oscillations in the form of Pierce's oscillator coupled with a harmonic selector circuit. It is clear that the only novelty disclosed in the claims of this patent is the Pierce oscillator. Indeed, the circuit covered in this patent is identical with a circuit described and shown in Fig. 2 of Pierce's expired patent. We therefore conclude that the patent is void for double patenting over the 1,789,496 patent.

Some of the claims of the remaining patent in this group, No. 2,133,648, cover crystals of specified dimensions and shapes to produce specific frequencies of oscillations, and other claims cover an impedance in the form of a variable capacitance, inductance or resistor inserted in the circuit containing the oscillator to

control the frequency of its oscillations. The first group of claims covering shapes and dimensions of the piezo-electric crystal were held by the court below to be invalid for double patenting over the No. 1,789,496 patent which had already claimed the use of crystals in general. That expired patent does not specifically disclose that a piezo-electric crystal may be cut to particular shapes or sizes to produce specific frequencies of oscillation. Nevertheless, it might well be inferred from the claim of crystals generally that specific shapes and sizes of crystals were covered, for if it was not already common knowledge that shape and size govern the frequency of crystals, as early as 1922 Professor Cady had pointed out in an article entitled "The Piezo-electric Resonator" that the frequency of the oscillations of a quartz crystal, said to be a preferred type of crystal in Dr. Pierce's expired patent, is a function of the dimensions of the crystal.

The second group of claims covering the insertion of an impedance in the oscillator circuit was held by the court below to be invalid for lack of novelty and for double patenting. This is clearly correct, for Professor Cady in his reissue patent Re 17,245 of 1929 showed an impedance, in the form of a variable condenser connected across a coil, in an oscillator circuit containing a piezo-electric crystal to control the frequency of the oscillations of the circuit. The only novelty in this group of claims, and their essential patentable element, is the use of Dr. Pierce's particular circuit wherein the piezo-electric crystal itself produced the oscillations instead of merely controlling oscillations produced elsewhere in the system as in Cady. But, of course, this, as we have repeatedly pointed out, is the same invention disclosed and covered in Pierce's expired patent.

As to these last three patents the plaintiff-appellant contends that summary judgment was improper and that she should have been allowed to present evidence on the issue of their validity at a trial. We are at a loss to perceive what evidence in addition to that before the court below would shed any further light on the issue. Nor do counsel for the plaintiff-appellant in their brief tell us what additional evidence they would like to present. They merely assert in their brief that they have additional evidence, and in their reply brief complain that they would have expatiated further on the question of the validity of these three patents had this court not limited their brief to 160 pages. The simple answer to this is that if they had directed their argument to essential basic issues instead of posing and repetitiously arguing twenty-eight more or less irrelevant separate questions, they would have had ample opportunity to present their argument to this court on these three patents within the space allowed them.

In our view the District Court correctly analysed the foregoing patents and applied correct principles of law to the evident facts. In accord as to patents Nos. 2,133,642, 2,133,646 and 2,133,648 see Judge Layton's opinion in Pierce v. Allen B. Du Mont Laboratories, Inc., D.C. Del.1959, 178 F.Supp. 84.

We come now to the two patents as to which there was a trial in the court below, the '643 and the '070 patents as we have referred to them hereinabove.

The 120 claims of the '643 patent cover various features to be incorporated in holding devices for crystals, each intended to cope with some particular problem arising from their use in radio oscillating circuits. For convenience the District Court divided the claims of this patent which were submitted to it for consideration in the plaintiff's post-trial brief into five groups.[5] We find that grouping entirely appropriate. Indeed, the District Court's grouping is appro-

---

5. The plaintiff contends that there is also a sixth group of claims in this patent which by her own admission correspond with a group of claims in the '070 patent. What we shall have to say with respect to the '070 patent will dispose of this asserted sixth group of claims.

priate for all of the claims of this patent and all of its claims, if not put in issue by the plaintiff in her pleadings, were put in issue by the defendants' counterclaims for declaratory judgments of invalidity. We shall follow the District Court's technique of decision.

That court found that the first group of claims, Nos. 10 and 74, cover a holder for the piezo-electric crystal which is hermetically sealed by filling any openings in it with wax, celluloid varnish or some similar substance to keep out dust or moisture which would interfere with the satisfactory operation of the crystal. The plaintiff contends that these claims also cover securing the crystal in its holder to prevent bodily movement therein and establishing electrical connection with the crystal so secured in such a way as to permit its free vibration with substantially no restriction.

Insofar as the claims cover these latter elements they do so in language only of function. Claim 74 in only slightly different language recites the same combination covered in claim 10, and claim 10 reads as follows:

"A piezo-electric-crystal holder comprising in combination a hermetically sealed closure and means within said closure for securing a piezo-electric crystal therein and establishing electrical connection therewith, while permitting the free vibration of said piezo-electric-crystal with substantially no restriction."

Only a hermetically sealed enclosure can possibly be said to be covered in anything but functional language.[6] Therefore that is the only element covered by this group of claims which we need to consider.

If Dr. Pierce was indeed the first to discover that the operation of piezo-electric crystals would be affected by dust, moisture etc., as to which there is considerable doubt, we think it obvious that the first expedient to occur to any rea-

sonably intelligent person working in the field to solve the problem would be to seal the crystal hermetically to prevent the intrusion of these foreign elements. Moreover, as the District Court pointed out, hermetically sealing a piezo-electric crystal to protect it from contact with water was shown in a British patent to one Langevin in 1921, No. 145,691, for a submarine signalling device using a piezo-electric crystal. And, U. S. Patent No. 1,495,429 issued to Nicholson in 1924 covers sealing such crystals in wax. These claims are clearly invalid.

The second group of claims covers mechanical means for mounting a piezo-electric-crystal apparatus in a circuit, insofar as specified at all, by means of a socket and plug device comparable, if not similar, to the familiar telephone socket or "jack," for the purpose of facilitating the ready exchange of crystals of different frequency in an electrical circuit. The evidence is undisputed that the use of plugs and jacks to provide means for rapidly changing the components of an electrical system was old by the time Pierce made his alleged invention. Plugs and jacks such as those shown by Pierce had long been used in the telephone art. Indeed, a patent to Donitz, No. 763,164 shows the use of plugs and jacks for switching coils in a wave meter and a patent to Varley, No. 772,591, shows plug and jack mountings for ready removal of induction coils in electric circuits. This group of claims is also clearly invalid over the prior art.

The third group of claims covers a holder for a piezo-electric crystal with a screw-threaded mounting therein for one electrode so that it can readily be moved closer to or further away from the crystal; the purpose being to vary the amount of electric current flowing to the crystal in order to vary its frequency. We have already pointed out that Professor Cady in his reissue patent Re 17,245 showed the use of an impedance in the form of a variable condenser connected across a coil to vary

6. At any rate, we shall cover Dr. Pierce's technique for holding crystals in our discussion of a subsequent group of claims of this patent.

the flow of current to a piezo-electric crystal to vary its frequency. Moreover, Professor Cady in the same article referred to hereinabove pointed out that if the air space between a crystal and one of its electrodes is increased the frequency of the crystal will be slightly raised. And it is clear from the evidence and the District Court found that a variable condenser is the full equivalent of Dr. Pierce's adjustable electrode. In fact, the court found, and we think it evident, that Dr. Pierce's adjustable electrode is nothing more than a form of variable condenser. Certainly there is nothing novel in a screw-threaded adjustment. Perhaps Dr. Pierce's device permitted fine adjustment of the frequency of his crystal but it certainly cannot be called an invention.

The fourth group of claims cover resilient means for holding a crystal in place in its holder, for if it were free to move about within its holder the changes in air space would produce small variations in its frequency, and if it were tightly clamped in its holder severe dampening of its vibrations would occur. The resilient means shown is a brass spring. This spring forms one of the electrodes, the crystal rests upon the other, and is so designed that it can be screw-adjusted to exert only slight pressure on the upper face of the crystal. The District Court held these claims invalid over the disclosures in a paper delivered by Dr. Pierce in October 1923 at a meeting of the American Academy of Arts and Sciences, and published in its proceedings, wherein he described in words and by reference to a drawing a "Mounting for Quartz Crystal of Piezo-electric Oscillator" as a hard rubber frame a little thicker than the quartz with sheets of brass to serve as electrodes screwed to the two faces of the frame and, "A thin sheet of spring brass

(marked 'filler') * * * inserted between one of the electrodes and the quartz, in such a way that only a light pressure [is] exerted on the quartz."

The plaintiff contends vigorously that the reference to the thin sheet of spring brass marked "filler" in the drawing does not refer to a spring but only to a "filler" designed to hold the crystal in place by its weight. We do not know why "spring brass" should be referred to unless to imply resilient pressure. But however that may be, the paper certainly discloses the problem of holding the crystal in place in its mounting by light pressure upon it, and, given the problem, a light spring would seem to us to be the first expedient to occur to anyone interested in solving it. We see no invention in these claims.

The fifth and final group of claims cover clamping crystals at their points of quiescence known as their nodal points to permit the crystals to be held rigidly yet with minimal dampening effect on their vibrations.[7] Dr. Pierce was not, and does not claim to have been, the first to discover that vibrating bodies, including piezo-electric crystals, have areas or points of quiescence, or nodal points, at which the vibrating body can be held without dampening its vibrations. Prior to Pierce, Professor Cady clearly disclosed that pressure could be applied to a crystal at its nodal points without dampening its vibrations in his article to which we have already referred. Furthermore, in the fourth group of claims considered above Dr. Pierce disclosed the utility to prevent minor changes of frequency of clamping the crystal in its holder, and to do so in such a way as to interfere as little as possible with its free vibration he suggested a light spring electrode. Given this knowledge, and knowledge that a crystal could be held at its nodal point, the novelty in this

7. The District Court aptly illustrated what is meant by the nodal point, or point or area of quiescence of a vibrating body, by reference to the common tuning fork. This device as is well known consists of two prongs joined like the tines of a two-tined fork to form a U-shaped structure with a handle at the bottom of the U where the instrument can be held without interfering with its vibrations as would be the case if it were held by either of the vibrating prongs.

fifth group of claims must reside in the means they disclose for holding the crystal at its nodal points.[8] Two means for holding crystals at their nodal points in a predetermined position in their frames are disclosed in this group of claims. One means consists of electrodes having narrow projections so positioned as to touch opposite faces of a flat crystal at its mid point where the nodal line for the longitudinal vibration of the crystal is located. The other means consists of oppositely disposed flat electrodes positioned to clamp a lenticular shaped crystal between them by gripping the crystal at its mid point of greatest bulge which lies on the nodal line of such crystals. In short, Dr. Pierce shaped either the electrodes or the crystal in such a way as to accomplish his end. And the shapes he employed certainly were not difficult to conceive. We quite agree with the District Court that an obvious expedient to accomplish Dr. Pierce's purpose is merely to give the crystal or its electrodes such a shape that the electrodes will touch the crystal only at its nodal points, leaving the rest of the crystal free to vibrate without restriction. Certainly there is no inventive novelty in the shapes employed to achieve the purpose. This group of claims is invalid for lack of invention.

So much for the '643 patent. Now we come to the last one in litigation here, the '070 patent.

The 30 claims of this patent can conveniently be divided into two groups, one group covering an evacuated sealed container for the crystal and the other covering immersion of this holder in a constant temperature bath. The District Court held both groups of claims invalid over the prior art and also invalid for functionality.

The evacuated holder for the crystal represents a definite advance over the hermetically sealed crystal holder claimed in the 2,133,643 patent considered above. The hermetically sealed holder prevented moisture, dust, etc. from affecting the frequency of the crystal, to be sure, but it did not eliminate two other phenomena harmful to its operation known as air column resonance and corona discharge. Obviously evacuation of the holder did as much to keep out dust, moisture etc. as hermetically sealing it. But evacuating the air from the holder did more in that it also prevented to a large extent air column resonance and corona discharge. But, as the court below pointed out, evacuated containers for components of electrical systems have been known for at least as long as Edison's electric light bulb. Moreover, the evidence is clear that long before Pierce, Langmuir, at least, had pumped more air out of De Forest's vacuum radio tube to reduce the harmful effects of gases therein two of which are air column resonance and corona discharge. No more needs to be said to show that these claims are invalid over the prior art.

The single claim covering immersion of the crystal holder in a constant temperature bath, if not also invalid over the prior art, is certainly invalid for functionality. It reads:

"Apparatus of the character described comprising an evacuated receptable, means for maintaining the receptacle at constant temperature, and an electro-mechanical vibrator contained in the receptacle."

In the specification, to which the reader is invited to refer for a description of the apparatus, all that is said about temperature control is that the sealed vessel, referring obviously to the evacuated crystal holder, "whether of metal or glass, may be kept in a constant temperature bath, as illustrated in Fig. 2." And all that Fig. 2 shows is a rectangle drawn around a vibrator receptacle, the area between the rectangle and the receptacle labelled "Constant Temperature Bath." No structure is covered in the claim or described anywhere in the patent nor is there any disclosure or suggestion whatever as to how constant tem-

8. There is no suggestion that Dr. Pierce contributed anything toward discovering the location of the nodal points or areas of quiescence of a crystal.

perature might be maintained in the bath. The claim is clearly and obviously void for functionality.

■ We have still to consider the other pair of appeals by the plaintiff below, her appeal from the orders of the District Court denying her motions to amend the judgment and to correct docket entries. The appellant's contention, insofar as her motion to amend the judgment is concerned, rests basically on two propositions. One is that she was deprived of a fair and full opportunity to present her case at the hearing on the defendants' motions for summary judgment, and the other is that not all of the claims of all of the patents were put in issue so that the judgment should be amended to cover only those specific claims of the patents which were in issue. She says in substance that at an informal conference with the court below prior to the date set for hearing on the motions for summary judgment her counsel "understood" that the hearing on the motions "would be restricted to the issue relating only to the said 'reasoning' of this Court, with respect" to the thirteen claims of the 2,133,642 patent considered in the American Communications and Hewlett-Packard cases. She says: "There was no understanding that there was to be considered any issue of double patenting with respect to the remaining claims of this basic patent 2,133,642, or that there was to be considered any issue of double patenting with respect to any of the claims of any of the other patents in suit." Wherefore she contends that her counsel was taken completely by surprise when he came to the hearing on the motions for summary judgment and quite unprepared to present his case on the broader issues then taken up for decision. Counsel for the appellee gives quite a different version of the informal conference preceding the hearing on the motions. He says that the only limitation

placed on the scope of the hearing by the court at the informal conference was that no consideration would be given to the issue of the functionality of the claims.

The informal conference was not reported so we have no positive way of knowing which version is correct. The action of the court in denying the motions, however, satisfies us that it agreed with the defendants' version. At least, the plaintiff has not established that her version is correct.[9]

The appellant bases her contention that not all of the claims of all of the patents here involved were put in issue largely on the answers she gave to certain interrogatories propounded by the defendants. We do not find the answers to which she refers in the record appendix to her brief. It will suffice to say that it is clear that all of the claims of all of the patents involved were put in issue by the pleadings and that the plaintiff appears to be the only one who did not so understand.

■ There is no substance whatever in the appellant's contention that a docket entry on September 15, 1958, to the effect that the defendants' motion to consolidate the two cases was allowed without objection should be deleted. She says that on that date there was no such motion pending and consequently there was nothing to which she could have objected.

It appears that at a pre-trial conference defendants' counsel, they were the same in both cases, suggested that the cases be consolidated to which plaintiff's counsel did not then disagree, that in January, 1958, the court entered its summary judgment as to the first four patents considered herein, that in July, 1958, the defendants formally moved for a joint trial of the cases as to the two patents remaining for disposition and that on September 15, 1958, the court allowed

9. Plaintiff also complains that the defendants filed an affidavit considerably less than ten days prior to the hearing on the motion for summary judgment, and another one after the hearing. However, plaintiff was allowed to reply to the first of these affidavits, and there is nothing to show that she would not have been permitted to reply to the second, had she wished to do so.

the motion. There was obviously no need for joint trial of the cases as to the first four patents after summary judgment had been entered as to them. And there certainly was no error in consolidating the cases as to the two patents remaining for trial. We fail to see the slightest need to amend the docket entry to show specifically that the cases were consolidated only for the purpose of a trial as to the two patents not disposed of on the motions for summary judgment. Moreover, we fail to see how an amendment of the docket entry is of any consequence whatever to the appellant.

Judgment will be entered affirming the judgment and orders of the District Court.